[No. C010377. Third Dist. Dec. 8, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL STEVEN MACK, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certifed for partial publication. Those portions directed to be published follow.

## COUNSEL

Manuel J. Baglanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Acting Assistant Attorney General, J. Robert Jibson and Karen L. Ziskind, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

DAVIS, J.—

### INTRODUCTION

Penal Code section 261, subdivision (a)(3) (undesignated section references will be to this code) defines as rape any act of sexual intercourse

where "a person is prevented from resisting by any intoxicating or anaesthetic substance, or any controlled substance, *administered by* or with the privity of *the accused*." (Italics supplied.) As shall be seen, we determine the qualifying phrase "administered by . . . the accused" requires only that a defendant have instigated or encouraged the ingestion of the resistance-suppressing substance and not—as argued by the defendant—that the resistance-suppressing substance be ingested by means of force or trick.

After three weeks of testimony and three weeks of deliberations in the defendant's 1990 trial, a jury found him guilty of the 1987 first degree murder (§§ 187-189) and rape (§ 261) of Karen W. The jury determined he did not intend to kill the victim by the administration of poison (§ 190.2, subd. (a)(19)) but could not resolve whether the murder was intentionally committed in the course of a rape (*id.*, subd. (a)(17)(iii)). The trial court, which had earlier struck an allegation that the defendant had lain in wait to commit an intentional killing (*id.*, subd. (a)(15), struck the rape-murder allegation on motion of the prosecution and sustained allegations that the defendant had served four prior prison terms (§ 667.5, subd. (b)).

Sentenced to state prison, the defendant's argument consists of three broad categories. He claims the trial court erred in excluding evidence of third party culpability, of the victim's drug-use habits, and of the victim's sexual history. He asserts the evidence is insufficient to establish the offenses of murder or rape, or to prove the cause of death. He argues it was error to fail to give a unanimity instruction regarding the theory underlying the murder verdict, and to refuse his "pinpoint" instruction relating identity evidence to reasonable doubt. We resolve all these adversely to the defendant in the unpublished portion of this decision. In the published portion, we reject his challenge to the supplementary definition of "administer" fashioned by the trial court in response to a jury request. We shall affirm.

## FACTS

The defendant devotes some 50 pages of his opening brief to setting out the facts, and 18 pages in his reply brief to "correcting" the People's facts. ■ Although his arguments relating to the sufficiency of the evidence require a thorough recount of the testimony at trial, we will be more succinct, limiting ourselves to the pertinent facts and not recounting every inconsistency in testimony because on appeal we must resolve any conflicts in evidence or credibility and draw all reasonable inferences in favor of the verdict. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Facts relevant to the defendant's arguments that we do not mention here will be incorporated in the discussion.

One set of facts is beyond dispute. On March 3, 1987, a Pacific Gas and Electric Company meter reader servicing his route discovered a car belonging to Karen W. behind a Super 8 motel at Hillsdale Boulevard and Madison Avenue. He was familiar with Karen W. and her car because he had been a regular customer of restaurants where she worked, and he was aware from news accounts that she and her car were missing. Responding to his call to "911," detectives determined it was the missing car. Although the doors were locked, they were able to enter through the unlocked back hatch. Inside, underneath a purse, a pile of clothing, and the carpeting covering the hatchback storage area, they found Karen W.'s clothed body tucked in a fetal position in a state of "moderately advanced" decomposition.

The autopsy revealed no major discernible external trauma and no disease pathology or abnormalities (other than those brought on by decomposition) in any of the major organ systems. The esophagus, stomach, and upper intestine contained a granular material that was reddish brown and yellow-tan; the same substance was present in the bronchial tubes and on her clothes.[2] The pathologist found sperm present in her vagina, but no sign of trauma to the genitals. Stains in her underwear contained large amounts of semen; blood typing analysis showed this to be type O. Karen W.'s blood type could not be determined, and the sample could have been admixed with fluids from her body. However, the defendant's blood test demonstrated that he was a type O secretor, while David Samas (the victim's roommate and inamorato) was a type B secretor, which would be physically inconsistent with the stains.[3] Residual blood drawn from the heart, the contents of the stomach, the vomit stains on the clothing, and tissue samples from the liver, kidneys, and lungs all showed the presence of oxycodone, more commonly known as Percodan.[4] The number of tablets taken cannot be calculated from the levels present in a body, but even the defense expert conceded the levels present in Karen W.'s body were 25 times what he would expect to see for a therapeutic dose. Half the time, a person of the victim's weight would be slightly sedated after one pill; two pills would cause marked sedation, three pills would cause dizziness and nausea, four would cause respiratory depression, and five would cause unconsciousness. The effects would start within

[2] While stomach materials can be forced out by the process of decomposition, both defense and prosecution witnesses believed she vomited before she died.

[3] Mr. Samas had testified that he and the victim had engaged in intercourse the evening before her disappearance, after which she had followed her customary postcoital hygiene.

[4] Although we will not recount it in detail, the jury was presented with evidence regarding the possible unreliability of residual blood from the heart in assessing the quantity of toxin present in a body, a mathematical error made in calculating the percentage of Percodan present in the stomach residue (which was corrected before trial), the effect of decomposition on chemical analyses, and the comparison of Percodan levels in the victim's body with the few other documented cases of intentional Percodan overdoses.

twenty minutes and hit their peak in one to two hours. Although a screening test showed the presence of cocaine metabolites, more detailed testing determined this was a "false positive."[5] The best estimate of the time of death was more than three days but less than a month earlier.

In the opinion of the pathologist and another prosecution expert, Karen W.'s death resulted from an overdose of Percodan since the autopsy results were otherwise normal. Both conceded this overdose could have been accidental. The prosecution expert noted that in 5 percent of all cases the manner of death could not be computed. The defense expert did not think the levels of Percodan were sufficient to be toxic, and noted that fatal allergic reactions to Percodan were rare. He concluded the cause of death was simply unknown.

According to Mr. Samas, he was not aware that Karen W. had ever used Percodan. She regularly took birth control and tanning pills, and also used aspirin.

After recovering the body from the car, the authorities spoke with the janitor at the motel. In his initial interview, he was extremely uncertain about the day on which the car appeared. Even though unsure about the day of the week, he was certain at trial that it had not been there when he arrived at work at 8:30 a.m. Upon returning from having coffee next door, he went out to the parking lot to pick up trash and saw the car. He observed a brown-haired, clean-shaven man in his 20's emerge from it. Because of the uncertainty as to the day, the supervising detective conducted a second interview later that evening. After some thought, the janitor settled on Friday, February 20, 1987, as the date he had first noticed the car because of his recollection of work he had been doing that week. Based on his description, the sheriff's department prepared a clean-shaven sketch. However, since the moustached defendant was considered a suspect, the photo lineup the janitor viewed contained pictures only of men with moustaches. At trial, the janitor stated none of them had looked familiar to him at first. He then selected the defendant's picture, but told the investigators he thought the defendant looked too old. (The defendant was born in 1949, and had greying hair.)

We now flash back a fortnight. Mr. Samas emerged from the shower early on the morning of Monday, February 16, 1987, to find Karen W. talking on the phone. The 27-year-old iron worker had been living with the 21-year-old waitress (and occasional model) in their Citrus Heights apartment since 1982

---

[5]The defense expert stated he "would not be surprised" if cocaine metabolites were undetectable after a period of decomposition.

or 1983.[6] Mr. Samas, who had not been on a job for one and one-half months, was heading to his union hall in search of work. Karen W. had just returned the previous day from a week at Club Med in Cancun, Mexico. She excitedly pointed at a napkin on the nightstand on which she was scribbling while talking. After she got off the phone, she showed him the note and told him she was a finalist for a Budweiser promotional calendar. There would be a photo session with "Paul" later in the week for which she would be paid $5,000, far more than she had ever before earned from modelling. This information was all jotted on the napkin.

On Tuesday, February 17, Karen W. spoke with Vicki Swigart by phone. The two had worked together at the defunct Warehouse Restaurant. Karen W. said she would be meeting with Paul Mack on Thursday morning for a promotional calendar for Budweiser (which was the first Ms. Swigart had heard about this), and then would meet Ms. Swigart in the parking lot between TGI Friday's and the Red Lobster Restaurant for lunch. Ms. Swigart testified she and Karen W. knew the defendant professionally as the person who printed promotional T-shirts for the Warehouse Restaurant.

On Thursday, February 19, Mr. Samas again awakened early and showered. Karen W. was still lying in bed. He spoke with her briefly on his way into the kitchen. She mentioned she would be having lunch with Ms. Swigart and then going to her fitness club before she went to work (her shift at the Peppermill started at 4 p.m.). They vaguely spoke of catching up with each other at the club. Mr. Samas ate his breakfast and left for the Florin Road union hall about 8 a.m.

Right around 9 a.m., the defendant called his barber (with whom he had a standing appointment between 9 and 10 a.m. to "do" his hair at least five times a week). He asked to reschedule for 2 p.m. or so.

Having obtained a work assignment in Stockton, Mr. Samas headed home from the union hall to get his tools. He arrived about 10 a.m. Karen W. and her car were gone. There was a note for him on top of her work clothes on

---

[6]Although at one point the victim and Mr. Samas had discussed marriage, their relationship was no longer exclusive by February 1987. During a recent stay in Cancun, she met Christopher Heermans, who testified they had a strong attraction for each other. They had talked about her coming to live with him; during the week after her visit, they corresponded and he sent her plane tickets to come to San Diego, as well as a purple plastic bracelet she was wearing at the time of her death. Mr. Samas acknowledged the victim had told him this on her return, although he was not sure how seriously he should take her plans. Another witness apparently had told the police at some point that the victim had said she might need a new place to live until a new job started in San Diego in March because Mr. Samas had found someone new; however, by the time of trial the witness (Vicki Swigart) had no recollection of this.

the bed: "Dave, went to shoot Budw[ei]ser cal[e]ndar if my work dress is not gone w/me by 3:30 come get me! [¶] I'm scared to go by myself but I have [to] wish U [*sic*] were here." (In general, she liked to have a friend accompany her when she modelled.) The note also gave directions to an address on Regard Way in the Antelope area. She had not earlier mentioned to him when this calendar shoot would take place. Mr. Samas did not give the note a second thought and headed off for Stockton.

Karen W. neither showed up for lunch on Thursday nor called. Ordinarily, although Karen W. was frequently late for appointments and would often cancel them, she would always phone. Ms. Swigart acknowledged at trial that although she had told the police about the calendar shoot, she had neglected to tell anyone about the defendant's involvement with it until she spoke with a defense investigator.

Gary Fry described himself at trial as being a self-employed manufacturer of gym equipment in early 1987. He knew the defendant through a mutual friend. He testified that the defendant called him at approximately 1:45 p.m. on the crucial Thursday and said he needed a ride home from a Shell station at Madison and Hillsdale. The defendant told Mr. Fry that while riding in a woman's car, he had an argument with her and had been ditched. Mr. Fry, who had people at his house, told the defendant to start walking and he would catch up with him as soon as he could. Mr. Fry left his home about 2 p.m. and picked up the defendant at an ARCO service station at Walerga Road and Hillsdale, less than a mile north of Madison. There did not seem to be anything out of the ordinary about the defendant. Mr. Fry dropped off the defendant at his Regard Way home. He acknowledged at trial he did not provide the authorities with this information until after the defendant fled the jurisdiction in April 1987. He denied being the defendant's cocaine supplier (as the defendant testified).

The defendant kept his barber appointment on Thursday afternoon (and on Friday morning as well). He did not appear nervous or upset, or any different than customary either time.

Mr. Samas left work about 3:30 p.m. and stopped by the Peppermill on his way home to let Karen W. know he had finally gotten an assignment. No one had seen or heard from her. Normally, she never missed a shift and called when she would be late. He headed straight home, picked up the note, and followed the directions to the Regard Way address, reaching there about 5:30.

When Mr. Samas knocked on the door, the defendant's fiancée answered; she had been living with the defendant for about four months, and the two

were making wedding plans. The defendant immediately joined her. Mr. Samas inquired if Karen was there. The defendant did not appear to have any recognition of the name. Mr. Samas pointed out that he had a note saying she was coming to this address, with directions. The defendant still denied any knowledge of the person Mr. Samas was seeking. Defeated, Mr. Samas drove home. Shortly afterward, the defendant phoned him. According to Mr. Samas, the defendant now acknowledged that he knew Karen W., but it had slipped his mind. She was supposed to come to his house for a job interview, but when the defendant found out she was planning on moving to San Diego he told her not to bother with the interview. Later that evening, Mr. Samas reported Karen W. as missing.[7]

The next evening (Friday, Feb. 20), Mr. Samas returned to the defendant's residence after work because as far as he knew the defendant was the last person to speak with Karen W. The defendant reiterated that he knew nothing beyond the fact she originally had an appointment to come to his house that they cancelled. Accompanied by the private investigator boy-friend of one of Karen W.'s friends, Mr. Samas again went to the defendant's house late that evening. They knocked on the door, but no one was home. Mr. Samas also returned to the neighborhood at 6:30 a.m. the next morning and again at 9 a.m., at which time he brought a picture of Karen W. with him and made unsuccessful inquiries about her among the neighbors. After calling the private investigator, he brought him along to a flea market where he expected to see the defendant and pointed the defendant out to him.

When deputies interviewed him at his home on Saturday afternoon (Feb. 21), the defendant told them he had met Karen W. several months earlier when he was supplying promotional materials to the Warehouse Restaurant. She was one of several people he was in the process of contacting for a sales job. At this point, he provided the police with a list of names on which Karen W.'s name appeared. Next to her name was written, "moved [*sic*] to San Diego." The defendant again said that when he called Karen W. on Thursday to give her directions, he found out she was planning on moving, so he cancelled the appointment. He told the police he then spent Thursday morning through early afternoon with his brother, at which point he went to a hair salon appointment. His brother corroborated his story.

Three of the women whose names appeared on the list provided to the detectives were acquainted with defendant. At trial, two of them said they

---

[7]Although the defendant has focused on every minute discrepancy in the substance and timing of what Mr. Samas reported to the police and what he recounted at trial, the bloodtyping evidence excluded Mr. Samas from committing the crime. Consequently, we do not recount any of these details, as they are not material in connecting either the defendant or anyone else with the crime.

had never been contacted by the defendant in 1987 about working for him; two of them added that they had specifically told the defendant they were not interested in sales work. One of them (Susan Adner) testified that when she called the defendant in late February 1987 about a problem she was having with a mutual friend (his ex-girlfriend, to be exact), he changed the subject and said he was being harassed by detectives because he was the last person to speak with a girl who disappeared; he said she was supposed to come to his house to talk about modelling some T-shirts, but she had never shown up. He told her the detectives would probably contact her because her name was on a list he had given to them, and asked if she would tell them that she had been interested in working for him.

At some point a pharmacy clerk reading newspaper accounts of the investigation saw the defendant's name mentioned and recognized it; obtaining a copy of his Percodan prescription from the files in the drug store where she worked, she turned it over to the police. Investigators spoke with the defendant's dentist, who was also his social acquaintance, on March 11. The dentist said he began prescribing Percodan for the defendant in December 1985 and had written about a dozen prescriptions of 12 to 16 tablets each between then and February 13, 1987. At trial, he said he prescribed the medication because of the defendant's on-going dental pain; he denied the defendant's claim he exchanged the prescriptions for cocaine. Upon being told by the detectives that the victim had died of a Percodan overdose, he agreed to relay information to them from any future interactions with the defendant, but drew the line at wearing a listening device. He took a car ride with the defendant on March 18. Contacting the detectives the next day, he told them the defendant had hinted that he should invoke a patient-physician privilege if questioned by the police. He also said the defendant was upset his ex-wife and ex-girlfriend had told the investigators that he liked young blondes. Finally, he said the defendant had told him to drive to the Super 8 motel to show him where the body had been found.

During a search in March 1987 of the defendant's home, detectives obtained fiber samples from his bedspread and bedroom carpeting. A criminalist matched these fibers with some found on both Karen W.'s exterior and intimate garments.

By early April 1987, the detectives were ready to obtain a warrant for the defendant's arrest. They made arrangements through his attorney at the time for him to surrender to their custody. Instead, he fled to Utah. Having heard

this, his brother came forward to investigators and admitted he had fabricated an alibi for the defendant at the defendant's request after consulting with him at the flea market on February 21. The defendant had told him he had never seen Karen W. that morning and had been running errands after they cancelled their appointment. He wanted an alibi because of past difficulties with the law.[12]

While on the run, the defendant phoned a long-time friend (Kim Landrum) who lived out of state, and told her he was being falsely accused of a crime he did not commit. He said he was supposed to have had an appointment to discuss modelling work with a woman he had never met before; she never kept the appointment. The detectives spoke with Ms. Landrum in November 1988 about this phone call, having first explained the evidence against the defendant.

To recount other odds and ends of the prosecution's case, a photographer friend of Karen W. (who had photographed her in past) saw a man he identified as the defendant come into the Peppermill on what the witness believed was the Friday she was on vacation and ask the "order girl" for Karen W.'s whereabouts. Four people who had lived with the defendant between the early 1970's and his capture in Utah all described him as regularly using or seeking Percodan for various asserted pains. Steve Cassani testified he had been on a ski trip with the defendant in January 1987. The defendant had mentioned he had met a woman with a "killer body" at the Warehouse Restaurant whom he would have liked to do some sort of modelling for him in connection with Budweiser; he also mentioned he was physically attracted to her. Mr. Cassani had observed the defendant use cocaine at dinner parties along with his dentist. The defendant's former wife testified that when the defendant helped set her up on her return to California, she stayed at the Super 8 motel (although there is a conflict between her original report to the police and her trial testimony as to who selected the lodgings).

When the defendant was extradicted from Utah in 1988, he was living under a false name and had married a woman who had no knowledge of his past. He stuck to his original story regarding the cancelled appointment. He affirmed that the people on the list along with Karen W. were possible employees. He denied ever having sought Karen W. out at the Peppermill. He acknowledged at trial that by this point he had no concern about protecting his relationship with his now-former fiancée.

The defendant testified at length in his own behalf. He had met Karen W. while she was working at the Warehouse and he was providing promotional

---

[12]The defendant had a history of theft-related offenses, including convictions for forgery (1971 and 1975), theft (1980), and possession of stolen property (1983).

T-shirts. In his contacts with her, she mentioned she might be interested in a sales position. He had been considering switching his line of business to selling beef jerky (a plan confirmed by his fiancée). Since he did not want to give up his promotional materials business, he was looking to hire someone to run it for him. He wrote out a list of possible candidates in December 1986, including the victim, Ms. Adner, a neighbor, and the two other women. He admitted Karen W. was the sole person he actually contacted toward this end. He had tried phoning her on February 13, but had been told by a man that she was in Mexico and would not be back until the following week. He spoke with her the following week to ask her about her interest in selling his product line for him. He called her again on Thursday to give her directions. She then mentioned she would be moving to San Diego, so they cancelled the appointment.

As he was getting ready to head to his daily barber appointment, she came by and said she still wanted to apply because her future plans were uncertain. He asked her into the kitchen, and while they talked about what the job entailed he rescheduled his hair appointment. Cocaine paraphernalia was on the table; she asked to use some, and the defendant joined her. In addition to ingesting cocaine, she smoked a joint (the defendant abstained). She also mentioned her preferred drug was methamphetamine. At this point, they both found themselves sexually aroused. They engaged in intercourse on the adjoining family room floor. She was fully conscious of her actions and appeared to be a willing participant.

After they dressed, she asked if there was any more cocaine and expressed interest in his bottle of Percodan on the counter. He told her it was a strong pain reliever. She asked if she could try one. As he left the room to see if there was any cocaine in his bedroom, he told her she could help herself. He did not actually see her ingest any Percodan. Unsuccessful at locating any more of the drug in the house, he told her his supplier was nearby. They left the house about 1 p.m. and headed to Mr. Fry's house in her car, both of them feeling high and giddy. Seeing an unfamiliar car out front of Mr. Fry's home, the defendant did not tell Karen W. to stop. When he told her they could not stop and get cocaine, she got angry and told the defendant to get out of the car. She ditched him at the ARCO station at Walerga and Hillsdale. He never saw her again. He called Mr. Fry, who came and picked him up at the ARCO station. The rest of the afternoon he devoted to errands before heading home to make dinner.

Mr. Samas came by later that day about 6 p.m., after the defendant's fiancée had come home. The defendant feigned ignorance of the victim's name, because he did not want to let on to his fiancée that he had been

unfaithful. After Mr. Samas left and the defendant recounted the conversation to his fiancée (who had not been paying close attention to it), the defendant then pretended to suddenly realize who it was that Mr. Samas had been seeking, at which point he called Mr. Samas and told him the story about the cancelled appointment. He wanted to protect his relationship with his fiancée, so he was not going to admit Karen W. had been there. (His fiancée was familiar with the victim, whom the defendant had mentioned before.) When Mr. Samas returned the next evening and mentioned that he had reported her missing, the defendant became fearful because of his past difficulties with the law. He called his brother and lied to him about Thursday morning in order to induce him to cover for him. His anxiety level increased when the private investigator introduced himself at the flea market on Saturday and then a homicide detective came to his home that evening. He felt he had to stick with his initial story, both to be consistent and because his fiancée was present during the interview. He decided to flee when he discovered he could not have his personal attorney appointed to represent him; he was distrustful of public defenders from past experiences.

In the course of his testimony, he contradicted a number of facts to which prosecution witnesses had testified. He claimed he never used Percodan before his dentist began prescribing it for him, although he could not remember if his roommate from 20 years earlier had provided any. He would get his cocaine from Mr. Fry for himself, his dentist, and Mr. Cassani, trading the cocaine for the Percodan prescriptions. He denied ever telling Mr. Cassani on the ski trip that he had a sexual interest in Karen W. He reasserted that he had never gone into the Peppermill to look for her. He was not a commercial photographer, and he was not aware that Karen W. worked part time as a model and had appeared in beauty pageants. He had never told Ms. Landrum or Ms. Adner that his appointment with Karen W. had anything to do with photography or modelling T-shirts, or that he had never met her before; he believed Ms. Landrum was recalling his recount to her of the accusations against him, while Ms. Adner was fabricating her story (about him asking her to say she had expressed an interest in working for him). He did not provide any explanation why she should do so. He did not tell Mr. Fry that he was calling from the Shell station across from the motel on Madison. At no point did he direct his dentist to drive to the Super 8 motel after the body was discovered.

The defendant presented witnesses who believed they had seen Karen W. in the company of a young man resembling the composite on Thursday *afternoon* at TGI Friday's. James Nunes had known her for years, and was having lunch there with his friends the Watsons (who were visiting from out of town). He spoke with her briefly. At trial, neither Mr. Nunes nor Mr.

Watson had any independent recollection of the exact date of the lunch, Mr. Nunes noting he often ate there with them. Mr. Nunes had contacted Mrs. Watson about two weeks after the disappearance to determine the date. By the time of the 1990 trial, she had discarded the calendar (never having been informed by anyone of its significance). She was certain it had to be the pertinent Thursday. She admitted she and her husband had been in Sacramento on three consecutive Thursdays that month (probably Feb. 12, Feb. 19, and Feb. 26) because of a problem with their rental property, and she could only exclude Fridays and weekends, because that was when her husband was on tour with his band. Since the victim was in Cancun on February 12 and was already missing by February 26, this left February 19. They all thought the duo looked fairly solemn through lunch. None of them recognized the defendant at trial. Mr. Nunes, who is also a professional musician with a band that tours nationally, recalls that Karen W. had spoken with him on a number of occasions as long as two years before her death about someone wanting to photograph her for Budweiser promotional materials. Mr. Nunes was leery of its authenticity, because he knew the Budweiser people who would be involved and none of them had mentioned doing any work in Sacramento.

In this same vein of attempting to establish that someone other than the defendant was trying to entice Karen W. with promises of modelling opportunities for Budweiser (which entirely ignores the fact Karen W.'s note and Ms. Swigart's testimony specifically identified the defendant as making such a promise), the Peppermill "order girl" testified that a man who did not resemble the defendant came into the Peppermill looking for Karen W. while the latter was in Cancun. She could not, however, say whether this was the same occasion as the one on which the victim's photographer friend saw the defendant speak to the order girl. Another witness testified she had been approached at a club by Mitchell Hart, who wanted to photograph her for a magazine and possibly a calendar. He gave her his business card (which she ultimately turned over to the police during the investigation). Later, when she was out on some occasion with Karen W., she pointed him out to Karen W.; the latter said he had wanted to photograph her for a Budweiser calendar as well. Mr. Hart was, in fact, called as a witness, but we need not recount his testimony other than to note it has no bearing at all on the defendant's guilt.

In an effort to impeach Ms. Swigart's recollections, the defense called the former owner of the Warehouse, who testified he was supposed to have lunch with Ms. Swigart and Karen W. some time around the latter's disappearance, but it had been cancelled because Karen W. had never confirmed it. However, he was not sure of the date, and Ms. Swigart had previously

testified that the pertinent Thursday lunch appointment had not included him.

Finally, in an effort to impeach the veracity of the notes Karen W. had written, the defendant introduced evidence that she had listed a phony address on her driver's license to qualify as an entrant in a Placer County beauty contest, that she had used return addresses other than her own for lottery tickets, that she had pretended to be "Mrs. Samas" to obtain medical benefits, and that she had misrepresented her vacation to some friends as being a modelling job in Mexico.

## DISCUSSION

## I, II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### *Instructional challenges*

### A.

Early during its first day of deliberations, the jury sent a note to the trial court. The court convened counsel in chambers and read its contents to them. The note stated, "We, the jury, request the following: Please define 'administered by' and 'the privity of the accused' as stated on Page 53, Line 3 of the jury instructions." The court noted this "refer[ed] to CALJIC instruction number 10.65" (the instruction defining the necessary general criminal intent for rape and the defense of a good faith belief in consent).[18] After three hours of research, court and counsel discussed the issue on the record.

The parties agreed to the court's proposed definition of "privity." With respect to "administered by," however, there was a predictable split on the manner in which the expression should be further defined. The defense

---

*See footnote, *ante*, page 1466.

[18]In pertinent part, the jury had been instructed, "In the crime. of rape[,] where the woman is prevented from resisting by a [resistance-suppressing] substance *administered by* or with the privity of the accused, general criminal intent must exist at the time of the commission of the rape." (Italics supplied.) The term "administered by" also appeared as part of the instruction defining the elements of rape: "Every person who engages in an act of sexual intercourse with a female person . . . [who] is prevented from resisting by any [resistance-suppressing] substance administered by the perpetrator, is guilty of the crime of rape in violation of . . . [s]ection 261 subdivision (3)."

preferred CALJIC No. 12.07 (based on Health & Saf. Code, § 11002), which provides, " 'Administer' means *the direct application* of a controlled substance, whether by injection, inhalation, ingestion, or any other means, *to the body* of a . . . [person] for that person's immediate needs." (Italics supplied.) The prosecution preferred an instruction drafted by the court, which modified the defense-proferred instruction in accordance with the definition of the term contained in Black's Law Dictionary: "As used in the instruction at Page 53, CALJIC No. 10.65, administer means directly applied the substance to the body of the other person *or caused or procured* the other person to take the substance into her system." (Italics supplied.) Defense counsel objected to this instruction as being too broad, because it encompassed "making the drugs available to her, just giving them to her, or the other person taking them voluntarily." In his view, "[']provide['] is far too broad a concept in this particular situation. Just having it out there on the table and just making it available, I don't think, should be sufficient. *There ought to be some active role that the defendant takes . . . .*" (Italics supplied.) After brief argument, the court instructed the jury with the version it had drafted.

▮ The defendant renews this issue on appeal, asserting this supplementary instruction would allow the jury to convict the defendant for merely having Percodan available that the victim wished to try of her own accord (the factual scenario to which he had testified). In his view, in order to convict a defendant of "resistance-suppressed" rape, a jury must find that a defendant "somehow *forced/tricked* [a victim] into taking the drug *against her will.*" (Italics supplied.)

In the first place, we note the defendant's instruction offered below was too narrow (although this does not end our inquiry). It would preclude a conviction except where a defendant himself directly applied the substance to the victim's body, excluding any situation where only the victim handled the resistance-suppressing substance. The catchall phrase, "or by any other means" in the defendant's instruction does not—as the defendant argued below—modify "direct application"; it enlarges the category of *means* of direct application.

Second, the defendant provides no authority for his conclusion that administration of the resistance-suppressing substance *must* be by means of force or trick. This misconceives the consent at issue in the crime. The defendant was not accused of *drugging* the victim without her consent; he was accused of *sexual intercourse* without her consent. The relevance of the resistance-suppressing substance is only to negate any inference of consent from what is in fact mere submission. Thus, the fact the victim willingly

partook of what she knew was Percodan is simply not relevant. This is clearer when the context is not controlled substances (where one might expect subterfuge to be required) but instead the age-old device of seduction, alcoholic beverages. At the turn of the century, the Supreme Court found evidence to be sufficient to support a conviction of resistance-suppressed rape without any force or trick on the part of the defendant in supplying the resistance-suppressing substance, i.e., alcohol. In *People* v. *O'Brien* (1900) 130 Cal. 1 [62 P. 297], the victim accepted the defendant's invitation to accompany him for drinks at his father's hotel, where she had drinks "on his invitation or that of others," after which her recollective powers ceased but "it was evident that some one had had connection with her . . . ." (*Id.* at pp. 3-4.) The main question for review was whether the act took place before or after her powers of resistance were overcome by alcohol. The court credited the victim's testimony in this respect and otherwise found the evidence was sufficient to establish all elements, including "the *administering* of intoxicating liquor . . . ." (*Id.* at p. 5, italics added.) The defendant's effort to analogize to robbery cases involving intoxication is flawed; the rape statute, unlike the robbery statute, has specific language relating to the question of suppressed consent.

This false premise of the defendant cast aside, there is no basis for challenging the court's supplementary instruction. Giving the statute an interpretation which respects legislative purpose while according the defendant the benefit of any ambiguity (*People* v. *Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186]), we believe the qualifying term "administered by or with the privity of the accused" requires only that the defendant has instigated the victim's ingestion of the resistance-suppressing substance. The qualifying term simply excludes criminal liability for situations where a person engages in a sexual act with a partner who has reached a resistance-suppressed state (that is short of insensateness)[19] through no encouragement by the defendant. It is clear the Legislature did not intend criminal liability in such a case, because otherwise, the statute would proscribe intercourse *whenever* resistance is prevented by some intoxicating, anesthetic, or controlled substance (which would be the result if the qualifying phrase "administered by" were not a part of the statute). (See 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against Decency and Morals, § 778, p. 878 ["Submission is not consent where the defendant knows that the person is unconscious [(§ 261, subd. (a)(4))] . . . [or] where the person is *deliberately made* unconscious or otherwise incapable of resisting [(§ 261, subd. (a)(3))] . . . ." (Italics supplied.)].) The supplementary instruction's use of the alternative formulation "caused or procured" sufficiently reflects this

---

[19]Intercourse with a person who has achieved a state of insensateness can run afoul of section 261, subdivision (a)(4).

criterion of instigation or encouragement. There is no reasonable likelihood any juror would interpret this language (*Boyde* v. *California* (1990) 494 U.S. 370, 380 [108 L.Ed.2d 316, 328-329, 110 S.Ct. 1190]) as permitting them to convict the defendant if (as he testified) he merely allowed Karen W. to have access to his Percodan and did not suggest to or encourage her to ingest them (whereupon she consumed a fatal overdose on her own volition without his knowledge). Therefore, the trial court's supplementary instruction was correct.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Raye, J., concurred.

A petition for a rehearing was denied January 7, 1993, and appellant's petition for review by the Supreme Court was denied March 10, 1993.

---

*See footnote, *ante*, page 1466.