Filed 11/13/13  P. v. Ramirez CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C070064 |
| Plaintiff and Respondent, | (Super. Ct. No. SF117110A) |
| v. | |
| PABLO RAMIREZ, | |
| Defendant and Appellant. | |

A jury found defendant Pablo Ramirez guilty of a July 2010 premeditated attempted murder of an infant in a car seat, assault with a deadly weapon of the infant, and shooting at an occupied vehicle.  It also sustained firearm enhancements.  Denying counsel's request to sentence defendant (born in August 1992) as a juvenile on the merits, the trial court instead sentenced him to state prison for the attempted murder for an indeterminate term of seven years to life (with a one-year determinate enhancement); it stayed execution of the maximum sentences for the assault and shooting offenses.  The court did not calculate conduct credits in its oral rendition of judgment; the minutes and

1

abstract of judgment awarded defendant conduct credits *equal to* his 249 days of actual presentence custody.

On appeal, defendant argues there is insufficient evidence of intent to kill on the part of the actual shooter, or of defendant's knowing encouragement of any offense. He further argues the trial court's personal "embellishments" during reinstruction of the jury in response to a hold-out juror had the effect of coercing the juror to vote guilty. Finally, he contends the trial court "abused its discretion" in denying his request for sentencing as a juvenile. We will affirm the judgment, with a modification to reflect the correct rate for accrual of defendant's custody credits.

## FACTUAL AND PROCEDURAL BACKGROUND

We resolve all explicit evidentiary conflicts in favor of the judgment, and presume in its favor all reasonable inferences. (*People v. Mack* (1992) 11 Cal.App.4th 1466, 1468.) "We include this reminder because defendant's rendering of the facts highlights what he deems to be inconsistencies and credibility issues with respect to the . . . witnesses. . . . [However], the jury resolved these credibility issues against defendant and we are bound by that resolution. Accordingly, we set forth the evidence without defendant's extensive commentary regarding its reliability." (*People v. Curl* (2009) 46 Cal.4th 339, 342, fn. 3.) We will include procedural details in the Discussion where pertinent.

The infant's mother and her then-boyfriend were socializing with others at a home. Late in the evening, they decided they needed to replenish the refreshments. The boyfriend's brother drove the mother, the infant, the boyfriend, and another friend to a Food-4-Less store in Stockton in the mother's car. The infant was in her car seat behind the driver, the mother sat behind the passenger, and boyfriend was between the infant and the mother.

2

The brother and the other friend got out of the car first and were no longer present as events began to unfold. The mother got out of the back seat, then bent down to retrieve her purse. Someone "grabbed [her] butt." Startled, she turned around and found defendant standing just a few inches from her face. The boyfriend immediately got out of the car and demanded that defendant back off and explain his behavior because she was his girlfriend. (At this point, only the infant remained inside the car.) The boyfriend was visibly angry. He told defendant that if there was going to be a fight, they needed to take it away from the car; the mother mentioned the presence of her infant inside. Defendant, accompanied now by another unidentified individual, seemed to back down and the situation cooled off for a moment, with either defendant or his companion offering his hand to shake. (The mother believed there had been another escalation of tension when the second individual first joined defendant, which defendant defused.)

At this point, a third person came from around the back of the mother's car and walked up to defendant, standing shoulder to shoulder with him, and pulled out a gun. He and defendant started jumping up and down while grabbing their crotches, cursing at the boyfriend and threatening to beat him up. At least the armed individual (and perhaps all of them) bragged about their group "running" with guns. Both the mother and her boyfriend pleaded with defendant's sortie to keep the gun away from the car because an infant was inside. When the mother tried to push the gunman toward the back of the car in the midst of her pleading, he first pointed the gun at the boyfriend, then yelled at the mother that he did not care who was in the car. He took a step toward the front of the car (standing parallel to the open back passenger-side door), reached around the boyfriend's left side, and fired four shots into the front passenger door below the door handle. The boyfriend described the infant's relative position as being "behind" the gunman.

As the boyfriend ran around the car to extract the infant, he saw the three men drive off slowly in a car that had been parked next to them with a couple of women in the car.  The occupants of the car gave him hard stares ("eye-fucking" him) as they passed.

The infant was uninjured.  The bullets penetrated the front passenger door.  One bullet had lodged in the driver's door.  Bullet fragments were found just below the door, on the floor of the back seat, in the cupholder of the infant's car seat, and between the cushion and shell of the car seat.

A defense investigator testified that he had interviewed the boyfriend over the phone in May 2011.  In this account, the boyfriend had said defendant had apologized and turned away when his two companions came up and "talk[ed] smack" to the boyfriend.  Defendant, however, did not leave the scene.

## DISCUSSION

### I.  Sufficient Evidence of Intent to Kill and Vicarious Liability

"Attempted murder requires the specific intent to kill" (and a direct but ineffectual act toward that goal) in the form of express malice, which is a desire for the victim's death or the knowledge "to a substantial certainty" that the result of death will occur. (*People v. Booker* (2011) 51 Cal.4th 141, 177-178; accord, *People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).)

The essence of defendant's argument is this:  Firing at the lower part of the front passenger door cannot rationally support an inference that the gunman intended to kill an infant in a rear car seat on the other side of the car, or knew to a substantial certainty that the infant's death would result.[1]  We disagree.  Ordinarily, the mere act of discharging a

---

[1] Defendant devotes substantial discussion to the insufficiency of evidence of a so-called "kill zone."  This is a theory of liability that draws an inference—from the nature and scope of the lethal force employed against a specific target—of an intent to kill not only

4

firearm into a car from close range can support the inference. (*Smith, supra*, 37 Cal.4th at p. 744.) Firing a lethal weapon purposefully in a lethal manner that *could have* inflicted a mortal wound is sufficient to give rise to an inference of intent to kill, even if it is the result of a transitory annoyance such as the mother's repeated pleas and her attempt to push the gunman away from the car, and even if the gunman otherwise lacked a clear motive for firing at the infant. (*People v. Houston* (2012) 54 Cal.4th 1186, 1218; *People v. Arias* (1996) 13 Cal.4th 92, 162.) While the infant was not in the direct trajectory of the bullets (cf. *Smith*, at p. 746), the infant was confined in a small space in which ricochet was possible with bullets that had sufficient force after penetration to pierce the opposite door, and in which fragments in fact flew about (landing in near proximity to the infant). Defendant thus exaggerates in describing the gunman's act as firing "well away from" the infant. Accordingly, a jury could rationally infer express malice on the gunman's part.

As for vicarious liability, it is proper where an accomplice through encouragement knowingly intends to bring about conduct that is criminal, and the resulting offense is reasonably foreseeable. (*People v. Medina* (2009) 46 Cal.4th 913, 920.) Defendant acted in solidarity with a companion openly brandishing a gun (leaving the crime scene in his company as well (see *id*. at p. 924 [including these as factors])), who boasted of making use of guns and who was evincing hostility toward the mother and boyfriend. Defendant participated in conduct that rationally can be viewed as egging on a display of aggression from the gunman. Under these circumstances, only a completely oblivious person would be unaware that the gunman was prepared to fire the gun, and the offenses of attempted

the specific target, but also a "concurrent" intent to kill anyone else within the area in which a defendant deploys the lethal force. (*Smith, supra*, 37 Cal.4th at p. 746.) It is unnecessary, however, to address this theory because we find sufficient evidence of express malice with respect to the victim. (*People v. Pham* (2011) 192 Cal.App.4th 552, 559-560.)

murder, assault with a deadly weapon, and firing at a car are reasonably foreseeable under those circumstances. Therefore, even without evidence of assistance, we find sufficient evidence of encouragement to support vicarious liability.

## II. Supplemental Instructions Were Not Coercive

On the morning after commencement of deliberations, the jury foreperson sent a note to the trial court. It stated, "We have a juror that stated 'I am thinking as the defendant' and is being ir[r]ational & difficult. Can we call an alternate? [¶] What are our options to call an alternate?" The jury also submitted a separate request for "the legal definition of 'intent'/'intent to kill.'" After conferring with counsel, the court decided to examine the foreperson in order to determine whether there were grounds to discharge the juror causing difficulty.

The foreperson revealed "all of us except this person have agreed . . . the defendant's guilty or not on all three counts. He's just the one holding us back." In a nutshell, the rest of the jury took exception to the dissenting juror's reliance from the outset of deliberations on unspecified personal experiences in giving defendant the benefit of the doubt as to the gunman's knowledge of the exact location of the infant in the car. The jury had also requested the court for further instruction on intent to kill in order to convince the dissenting juror that this was not a reasonable doubt.

With the assent of counsel, the trial court decided to reread the following instructions after the lunch break. "You must decide what the facts are. It is up to all of you and you alone to decide what happened based only on the evidence that has been presented to you in this trial. [¶] Do not let bias, sympathy, prejudice, or public opinion influence your decision. Bias includes but is not limited to bias for or against the witnesses, attorneys, defendant, or alleged victims based on gender, nationality, national origin, race or ethnicity, religion, age, or socioeconomic status. Keep that in mind. [¶] And also the following—and *my comments and my reminding you of some of the*

*provisions within the instructions are intended to address all of the questions I received and concerns I received this morning.* [¶] Also on page 2, the following: Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. That is, those that have legal meanings that are different from their meanings in everyday use, they're specifically defined in the instructions. Please be sure to listen carefully and follow the definitions that I give you. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings. [¶] . . . [¶] The word 'intent' and the words 'intent to kill' are not specifically defined, which means they are to be given their ordinary, everyday meaning, okay? Everyone understand? [¶] That's the . . . definition provided, that's the only response I can give you. There is no definition provided different from the meanings of those words in their everyday use." (Italics added.)

After rereading the instruction on the definition of "reasonable doubt," the court concluded, "Now, I remind you the word 'evidence' does have legal meaning, other than ordinary everyday use. And that's on page 7, there's an entire page there of what is evidence. And I remind you that evidence is—as indicated on page 7—well, let me remind you, you must decide, as I've already said, what the facts are in this case. You must use only the evidence that was presented in this courtroom. Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. And I really told you nothing else, other than the exhibits and the testimony. *So you must decide the case based on the evidence and, again, evidence has a specific meaning, it is the sworn testimony of witnesses and the exhibits admitted into evidence. That . . . alone must form the basis of your decision in this case.*" (Italics added.) Less than 20 minutes later, the jury announced it had reached its verdicts.

Conceding that the rest of the reinstruction was correct, defendant argues the court's personal comments (which he identifies as the remarks we have italicized above) singled out the dissenting juror and encouraged him to abandon his opinion—which he could properly base on his life experiences (*In re Malone* (1996) 12 Cal.4th 935, 963)—and embrace that of the majority.

In the first place, "When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 802.) Beyond a perfunctory suggestion that a reasonably competent attorney could view the supplementary instruction only as being erroneously coercive, defendant does not provide any basis for avoiding forfeiture.

On the merits, we also disagree that the dissenting juror reasonably could have viewed the supplemental instructions as an encouragement to abandon his opinion (*People v. Alexander* (2010) 49 Cal.4th 846, 931), or draw such an inference merely from the speed with which the jury rendered its verdicts afterward (*id*. at p. 932). The instructions do not direct themselves explicitly at the dissenting juror with a command to reconsider his views in light of the majority or to acquiesce in the verdict without considering the evidence. (*People v. Whaley* (2007) 152 Cal.App.4th 968, 983.) It is not unduly coercive to reinstruct on the law in a neutral manner. (*Alexander,* at p. 931.) The supplemental instructions also did not preclude the dissenting juror explicitly or implicitly from interpreting the evidence at trial based on his personal experience, as defendant suggests. Even if the dissenting juror discerned that the supplemental instructions were the result of his disagreement with the majority, their import was simply to focus on the evidence at trial and the everyday meaning of intent in deciding

whether he had a reasonable doubt of defendant's guilt. Defendant's interpretation simply is not a reasonable reading of them, and we accordingly reject his claim of error.

### III. Defendant *Could Not* Be Sentenced as a Juvenile

Invoking the principles of *Graham v. Florida* (2010) 560 U.S. 48 [176 L.Ed.2d 825] and *People v. Caballero* (2012) 55 Cal.4th 262, which preclude the sentencing of juvenile offenders to prison for *life without the possibility of parole* or for a determinate sentence that is the *equivalent* of life without the possibility of parole, defendant contends the trial court abused its discretion in denying his motion for sentencing him as a juvenile because it did not consider the factors underlying these decisions and made "a mere mechanical application of sentencing rules." The constitutional principles of these cases are inapposite, because defendant will be eligible for parole before he is 30. The fact that a sentence is otherwise *mandatory* does not bring it within the ambit of these cases, as defendant apparently believes.

Absent this constitutional mandate, the trial court did not even *have* discretion to consider defendant's motion on the merits. Defendant comes within the statutory disqualification from placement with the Department of Juvenile Justice (DJJ)[2] because his present conviction is a violent felony (Pen. Code, § 667.5, subd. (c)(7)) and is subject to a punishment of an indeterminate life term (*id*., §§ 1170.17, subd. (a), 1170.19, subd. (a)(1); Welf. & Inst. Code, § 1732.6; *People v. Thomas* (2005) 35 Cal.4th 635, 643 [no discretion to order DJJ commitment or any lesser placement for commission of violent offense subject to life term or other sentence resulting in confinement past age of 25]).

---

[2] The agency within the Department of Corrections and Rehabilitation that houses juvenile offenders is in fact called the Division of Juvenile Facilities. However, the common practice is to refer instead to its parent agency, the DJJ. (*In re D.J.* (2010) 185 Cal.App.4th 278, 280, fn. 1.) We acquiesce in this practice.

## IV. Conduct Credits

Neither party takes note of the award of conduct credits on a one-for-one basis for defendant's 249 days of custody. This was incorrect. Defendant's conviction for attempted murder (and his indeterminate life sentence) limit his accrual of conduct credits to 15 percent of his days of custody. (Pen. Code, §§ 2933.1, subd. (a), 667.5, subd. (c)(7) & (12).) We shall direct the trial court to prepare an amended abstract of judgment limiting conduct credits to 37 days. As this is an uncontroverted matter that is erroneous as a matter of law, we do not see any purpose in soliciting supplemental briefing regarding this disposition. Should defendant purport to be aggrieved as a result, he may petition for rehearing. (Gov. Code, § 68081.)

## DISPOSITION

Defendant's conduct credits are reduced to 37 days, for a total of 286 days of presentence credits. As thus modified, the judgment is affirmed. The trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

BUTZ_____, Acting P. J.

We concur:

MURRAY_____, J.

HOCH_____, J.

10