[No. F020196. Fifth Dist. Nov. 16, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
MANUEL CORTEZ, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

### COUNSEL

Gregory Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Edgar A. Kerry and Robert P. Whitlock, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**ARDAIZ, P. J.**—On April 29, 1993, an information was filed in Stanislaus County Superior Court charging appellant with three counts of rape in

violation of Penal Code section 261, subdivision (a)(4).[1] Counts IV through VI charged appellant with, alternatively, having committed rape in violation of section 261, subdivision (a)(3).[2] Appellant was also charged with the felony false imprisonment of both the rape victim and another person in violation of section 236, and resisting arrest in violation of section 148. During arraignment, appellant pleaded not guilty to all charges.

Jury selection commenced on June 21, 1993. Outside the presence of the prospective jurors, appellant objected to the introduction of numerous photographs of the victim, some of which depicted writings on her body, as well as any reference to the writings being gang graffiti. The court concluded the photographs were admissible but deferred ruling on the gang graffiti issue. The court did however, direct the parties to refrain from introducing testimony identifying the writings as gang names until such time as the court could hear further evidence followed by arguments from counsel. The jury was then selected and sworn.

At the conclusion of the People's case-in-chief, appellant made a section 1118.1 motion directed solely at counts I through VII; he essentially conceded that sufficient evidence existed to support a conviction on the charge of resisting arrest contained in count VIII. Following lengthy arguments, the court denied the motion but agreed to strike the reference to the rape victim, Lorena, contained in the false imprisonment count.

The court then granted the prosecutor's request to amend the language contained in counts IV through VI to charge appellant with having committed rape accomplished while the victim was "rendered temporarily incapable of giving legal consent to the commission of said act by the administration to her of alcohol, by or with the actual knowledge of . . . [appellant] . . . ."

During closing argument, the prosecutor informed the jury that counts I through III were alternative charges to those set forth in counts IV through VI. The prosecutor also explained that, with respect to the rape charges, appellant was charged as a principal in counts I and IV and as an aider and abettor in the remaining counts. Counts II and V charged appellant with having aided and abetted Brian O. while counts III and VI charged appellant with having aided and abetted Ricky M.

---

[1]This subdivision defines rape as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, . . . [¶] [w]here a person is at the time unconscious of the nature of the act, and this is known to the accused." (§ 261, subd. (a)(4).)

All future statutory references are to the Penal Code unless otherwise indicated.

[2]Under this subdivision, rape is defined as: "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [¶] [w]here a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, administered by or with the privity of the accused." (§ 261, subd. (a)(3).)

Appellant was subsequently found guilty of resisting arrest, one count of misdemeanor false imprisonment, and all three counts of rape accomplished by means of administering an intoxicating substance. The jury acquitted appellant of all remaining charges.

On August 3, 1993, the date set for imposition of sentence, defense counsel renewed his motion for acquittal under section 1118.1 as to counts IV, V and VI. The court denied the motion and proceeded to sentence appellant.

Probation was denied and appellant was ordered to serve the upper term of eight years in prison on count IV. This was designated the principal term. The court then imposed two 6-year terms on counts V and VI and two 1-year terms on counts VII and VIII. Each of these terms were to run concurrent to that imposed on count IV.

This appeal followed.

## FACTS

On February 16, 1993, 17-year-old Brian O. stayed home with his 2 siblings when his mother and stepfather left on their honeymoon. Sometime later, his then current girlfriend, 14-year-old Shana F., came over to visit.

Around 10 p.m., 15-year-old Lorena R. and appellant arrived at Brian's house.[3] At some point during the evening, Shana said that she, appellant and Brian went to the store to purchase some brandy.

Brian, Shana, Lorena and appellant sat in Brian's bedroom drinking alcohol and listening to the stereo. After a few hours, Lorena asked Brian and Shana to leave so that she and appellant could "mess around." Brian and Shana granted her request and went to the living room.

As a result of her drinking three 40-ounce bottles of beer and some brandy, Lorena's memory of the evening's events was rather vague. She did, however, recall engaging in consensual sexual intercourse with appellant once during the evening.[4] She also recalled dressing afterwards in her overalls, black underwear, and blue and white shirt.

About that time, 17-year-old Ricky M. showed up at the house. He, along with Brian, Lorena, Shana, and appellant, listened to music and drank

---

[3] At the time, Lorena had known appellant for approximately one and one-half years and had dated him intermittently for the last eight or nine months.

[4] Appellant and Lorena had engaged in sexual relations prior to this occasion.

alcohol in Brian's bedroom. According to Shana, after a while, Ricky left the room and the two couples who were lying on the bed began "making out."

When Brian suggested that they switch partners, Shana became angry and left the room. Everyone was clothed at that time.

Thinking Brian was taking too long to come out of the bedroom, Shana decided to check on him. Upon doing so, she discovered Brian rubbing up against Lorena's naked body.[5] Shana thought that Lorena was passed out at the time but was not certain.

Shana went berserk. She got a knife from the kitchen and headed for the bedroom with the intention of killing Lorena when either Ricky or appellant stopped her.[6] She was angry with Lorena because, contrary to her earlier testimony regarding Lorena's unconscious state, she thought Lorena knew what was occurring and was simply letting it happen.

Shana tried to use the phone at Brian's house to call the police but discovered that someone had cut the line.[7] She ran to a nearby store hoping that she could use their telephone to call her mother. She thought she was on the phone when appellant grabbed her by the hair, picked her up, and pulled her back to Brian's house against her will.[8] By this time, Shana said she was so angry that she did not pay much attention to anything that happened afterwards.

After Shana was returned to the house, Brian, dressed only in his pants, came into the room where she was seated. Shana thought that he had been in the bedroom with Lorena but Brian claimed to have been washing his hair. Shana then went to the bedroom where she saw Lorena passed out.

Brian and Shana continued to argue. Approximately five minutes later, Shana's mother arrived at the residence. Shana went outside but then remembered that she had left something behind. When she returned to the residence, Brian broke the mirror Shana had given him, using his hand.

---

[5]At trial, Shana initially denied having found Brian on top of Lorena. However, as her testimony progressed she went from complete denial, to not knowing who she had seen due to her alcohol consumption, to mistakenly thinking she saw Brian on top of Lorena, to finally admitting that she really believed that she saw Brian rubbing his body against Lorena's.

[6]According to Ricky, Shana wanted to stab Brian—not Lorena.

[7]Ricky said that he watched as Shana tugged on the phone with the cord stretched tight across a sharp edge of an old stove. Eventually, the cord gave way. Ricky provided this explanation only after he was accused of cutting the cord.

[8]Ricky said that he, not appellant, restrained Shana that evening and prevented her from leaving the house because she was acting crazy. However, in his later testimony, Ricky admitted that Shana may have left the house sometime prior to her mother's arrival.

She then left Brian's home. When Shana got to her aunt's house, she telephoned the police because she was "a little" worried about Lorena.

According to Ricky M., Shana had already left the residence when "they" told him that Lorena wanted him in the bedroom. Ricky obliged by going to the bedroom where he found Lorena laying on the bed, awake and giggling. She reached out to him and they very briefly engaged in sexual intercourse. With the bathroom light illuminating the bedroom, Ricky could see that Lorena's body was unmarked at that time.

Afterwards, Ricky joined Brian in the kitchen. Appellant came in briefly, carrying a black marker in his hand, got a beer out of the refrigerator, and left the room laughing.

Deputy Higginbotham, a deputy sheriff for Stanislaus County, was on duty in the early morning hours of February 16, 1993, when he was dispatched to 504 Santa Cruz Avenue, Modesto, to investigate the possibility of juveniles consuming alcohol or narcotics at that location. He arrived on the scene at 4:25 a.m.[9]

Once inside the residence, the deputy observed Ricardo (Ricky) M. sitting in a chair in the living room. When Deputy Higginbotham heard squeaking noises coming from a nearby room, he decided to investigate.

The deputy entered Brian's well-lit bedroom and saw appellant engaged in sexual intercourse with a woman. Appellant, seeing the officer, stopped what he was doing and ran into the bathroom. The deputy noticed that appellant had an erect penis as he fled the room.

Believing he had witnessed a rape, Deputy Higginbotham pursued appellant and caught him in a nearby bedroom. The deputy led appellant to the living room and advised him that he was under arrest for rape and false imprisonment.

The deputy then returned to the bedroom to check on the woman's condition. The woman, subsequently identified as Lorena R., was unconscious and dressed in only a cotton T-shirt that had been pulled up above her breasts. Deputy Higginbotham noted that Lorena had markings over the greater part of her body. Of particular note was the fact that her vaginal area had been painted black and appeared to be covered with petroleum jelly.

---

[9]The officer initially testified he could not remember the exact time of his arrival. It was only on rebuttal that he provided this information.

Deputy Higginbotham tried to revive Lorena by talking to her, shaking her, and, finally, initiating sternum stimulation.[10] When these efforts failed, the deputy summoned emergency personnel.

The deputy then returned to the living room just in time to see appellant run out the front door. Fellow officers pursued and caught appellant a short time later.

Brian and Ricky were also placed under arrest. The deputy could tell that Brian, Ricky and appellant had been drinking by the smell of alcohol on their persons.

While searching the residence for evidence, Deputy Higginbotham discovered a blood-covered knife, a beer can, and a foil packet containing a petroleum jelly-type substance on the nightstand next to the bed where Lorena had been found. The deputy also noted that the bedding appeared wet and had some red spots on it. He found a black chemise on the floor and a pair of woman's underwear on the bed.

A search of the bathroom that separates the first and second bedrooms revealed blood on the floor, a chair, and on the side of the bathtub. The deputy then proceeded to search the second bedroom where he found a container of petroleum jelly in a night stand. He also retrieved a pair of women's underwear and a bra from the floor.

In the kitchen, he located "some" bottles of brandy—either quart or half-gallon capacity. He noted that one bottle was empty while only a portion of the others had been consumed. He also found some wine bottles and 40-ounce beer bottles. Throughout the house, the deputy observed numerous 12- and 16-ounce beer cans.

In the living room, Deputy Higginbotham found a towel with what he believed to be blood on it. The only person observed to have been bleeding that morning was Brian O. Brian appeared to have cut his hand on a broken mirror that was found in the bedroom where Lorena had been discovered earlier.

An ambulance arrived on the scene at 5:09 a.m. The emergency medical technicians administered oxygen to Lorena and were able to get her to open her eyes and move her extremities on command. They could not, however, get her to respond verbally. Lorena was transported to the hospital and arrived around 5:30 a.m.

---

[10]This last procedure is commonly used to revive persons rendered unconscious due to excessive alcohol consumption.

Lorena was not sufficiently awake or alert upon arrival for the rape examination to be conducted. When the exam was finally performed at 5:40 a.m., no signs of genital trauma were noted. Physical evidence was gathered and photographs taken. The blood specimen collected at 6:10 a.m. was subsequently tested and revealed a blood-alcohol level of .28.[11] The examining physician diagnosed Lorena as having an "[a]ltered mental status" and suffering from alcohol intoxication.

Detective Carter responded to the hospital to retrieve the specimens gathered during the sexual assault examination. While there, the detective saw Brian and noticed he had black marks on the back of his arms that appeared to have been made using a black marking pen. These marks looked like "Xs or in some type of graffiti type writing."

Detective Bosma of the Stanislaus County Sheriff's Department first contacted Lorena in the emergency room of the hospital on the morning of the 17th. The detective tried to interview Lorena but could not keep her awake long enough to answer his questions.

He contacted Shana around 3 p.m. the same day. He found her awake and alert—she did not appear to be angry or intoxicated. Shana's statement was, for the most part, consistent with her trial testimony. It did, however, vary in some significant respects.

For example, Shana told the detective that the three young men were forcing Lorena to drink so that they could take advantage of her. Yet, at trial she said that the three young men were simply encouraging Lorena to drink by saying things like, "drink up" or "go ahead, take a shot." Shana admitted that "Brian or someone" brought Lorena some brandy while she was in Brian's bedroom.

Shana also told the detective that she had seen Brian and Ricky engage in sexual intercourse with an unconscious Lorena. At trial, however, she claimed to have seen Brian merely rubbing against Lorena. She also testified that she did not recall telling Detective Bosma that Lorena was passed out at the time she saw Brian on top of Lorena. Nor could she recall telling the detective that Lorena was "stone cold out" when Ricky had sex with her.

Finally, Shana testified that she was not truthful with the officer and had told him many lies simply because she was angry and wanted to get Brian in trouble.

---

[11] It is important to note that this specimen was taken nearly two hours after the deputies first arrived on the scene.

During trial, Lorena consistently said that no one encouraged her to drink that evening. She also testified that she did not consent to have sex with either Ricky M. or Brian O. that evening. Nor did she tell appellant that she wanted to have sex with anyone else that evening. While she "probably" would have consented to having sex with appellant again during the evening if he had expressed a desire to do so, she did not actually consent to having sex with him a second time.

Defense counsel asked Lorena if she would allow appellant to have sex with her while she was unconscious. At first, she was uncertain about such a prospect but when questioned further, said she would want to be awake.

Lorena also said she did not have any markings on her body at the time she first had sex with appellant, although she did allow Shana to write Shana's name and phone number on her left arm sometime during the evening. The last thing she remembered was getting dressed and listening to the stereo in Brian's bedroom before passing out. She did not have any markings on her body at that time and did not learn of them until she awoke sometime later in the hospital.

Thomas Keener, a senior criminalist, analyzed some of the physical evidence gathered in this case. Blood samples taken from Lorena, as well as each of the suspects, were later tested. The results of those tests showed that Lorena was a type O secretor with a PGM type of two plus; Brian O. was a type O secretor with a PGM type of two plus one minus; Ricky M. was a type A secretor with a PGM type of two plus; and finally, appellant was a type O secretor with a PGM factor of one plus.

The vaginal swabs obtained during the sexual assault examination revealed the presence of ABO types A and O as well as the PGM type two plus. Of the suspect males, these results were consistent with only Ricky M.'s ABO and PGM types. Mr. Keener explained that Lorena's PGM type would mask Ricky's PGM type of two plus.

A stain taken from Lorena's underwear was analyzed and found to be consistent with appellant's ABO and PGM types. The criminalist explained that secretions found here commonly result from vaginal discharge of fluids. The presence of such evidence would be consistent with Lorena having put on her underwear after sexual intercourse.

Two semen stains found on the bed sheets were examined and found to come from both type A and O secretors. Three PGM types were also identified which led the criminalist to believe that more than one person was

responsible for the stains. Ricky M. could have contributed the type A while the type O could have been contributed by Lorena, appellant or Brian. If one were to assume that sexual intercourse was had with Lorena, then the PGM types found would be consistent with those of Brian and appellant.

Another criminalist, Richard Lynd, was called to testify about the results of his comparative analysis of the pubic hair samples taken from Lorena as well as the male suspects. Of the hairs found on the victim, only one was foreign to her and consistent with appellant's sample, while one of the hairs found on Ricky was consistent with Brian's sample.

*Defense*

Appellant testified on his own behalf. According to appellant, he and Lorena were "seeing each other" around the time of this incident and, on a fairly regular basis, would get drunk together and have sex. There was usually no need to use lubricants during their sexual encounters.

Appellant said that, on the evening in question, Lorena telephoned him and asked if he "want[ed] to party." He told her he didn't care but before he knew it Lorena arrived at his home. She appeared sober at the time but told appellant that she had consumed "[s]ome 40s" earlier in the day. They then decided to go to Brian's house.

Shortly after they arrived at Brian's, they began drinking. Appellant said there was no need to leave the house to buy alcohol as there was plenty there.

Hours later, appellant and Lorena engaged in consensual sexual intercourse. Afterwards, they dressed and returned to the living room.

Later in the evening, Brian asked appellant if he could "go out" with Lorena and suggested that appellant "go out" with Shana. Brian also asked about switching partners so that he could have sex with Lorena. Appellant knew he and Shana would never go out because she hated him. He did not seem to mind, however, if Brian and Lorena got together.

Brian then went into the bedroom to talk to Lorena. He did not say anything about having sex with her at that time. Brian had been gone about 35 to 40 minutes when Shana came into the kitchen acting wild and claiming to have seen Brian with Lorena. Based on their earlier conversation and Shana's accusations, appellant thought that Brian was "going out" with Lorena.

Shana tried to telephone someone from Brian's house, but the cord "busted" which caused her to become even more upset. She grabbed a knife and started waving it around. Ricky managed to get the knife away from Shana, who then ran outside screaming and yelling at Brian through the walls.

After roughly five minutes had passed, appellant went outside and tried to talk to Shana. When his attempts to calm her failed, he picked Shana up by the waist and carried her inside. He denied grabbing Shana by the hair.

Shana finally telephoned her parents, but only after she calmed to the point where she was not screaming at the "top of her lungs." Appellant made no attempt to dissuade her from doing so.

Appellant denied aiding or suggesting that either Brian or Ricky engage in sex with Lorena. He said he first learned that Ricky had sex with Lorena when he, appellant, went back to check on her after Ricky returned to the kitchen.[12]

Appellant also denied writing on Lorena and claimed to have no knowledge as to who had done so. He did admit to having seen Shana with the marker. Due to the darkness of the room, appellant said he could not tell whether the markings were present when he had sex with Lorena for the second time that evening.[13] Appellant said he does not "tag" and would not have done so for his friends.

He also said he could tell that Lorena was awake for "most" of their second sexual encounter that evening because she responded to him. He maintained that a mere five minutes had passed when the officer entered the bedroom.

Appellant admitted to fleeing after his arrest. He said he ran away because he was afraid of being convicted of a number of crimes he did not commit.

Finally, appellant acknowledged that, in 1992, he was convicted of assaulting someone with force likely to produce great bodily injury in violation of section 245, subdivision (a)(1). Despite the fact that he pleaded guilty to the charge, appellant asserted he had acted in self-defense and was wrongfully convicted.

---

[12]Appellant later testified that he did not know that Ricky had had sex with Lorena. He first learned about Lorena and Brian when Shana "busted" Brian.

[13]During cross-examination, appellant admitted that he had no difficulty finding his way to the bathroom to retrieve his clothes when the officer arrived but claimed it was his knowledge of the layout of the house and not the lighting conditions that allowed him to do so.

DISCUSSION

I

*Claims of Instructional Error*

 Appellant maintains the court committed reversible error when it instructed the jury using a modified version of CALJIC No. 10.02. The instruction, as given, provides:

"The defendant is accused in Counts IV, V and VI of the information of having committed the crime of rape, a violation of Section 261.3 of the Penal Code.

"Every person who engages in an act of sexual intercourse with a female person not the spouse of the perpetrator, when such female is prevented from resisting by any intoxicating substance *administered by or with the actual knowledge of the perpetrator*, is guilty of the crime of rape, in violation of Penal Code section 261 subsection three.

"In order to prove such crime, each of the following elements must be proved: One, a male and female person engaged in an act of sexual intercourse.

"Two. Two persons, the two persons were not married to each other.

"Three. The female was prevented from resisting the act by an intoxicating substance.

"Four, the substance was *administered by the perpetrator or by another person with the perpetrator's actual knowledge*.

"And *synonyms for administering would be to give or to furnish*.

"Any sexual penetration, however slight, constitutes engaging in the act of sexual intercourse. Proof of ejaculation is not required." (Italics added to challenged phrases.)

Appellant's initial complaint revolves around the fact that the jury was instructed they could find him criminally liable under section 261, subdivision (a)(3) if they found the intoxicating substance was "administered by the perpetrator or by another person with the perpetrator's actual knowledge." He claims that "actual knowledge" does not equate with the statutory element of "privity" and that it was therefore error for the trial court to instruct the jury as it did.

"Penal Code sections must generally be construed ' "according to the fair import of their terms, with a view to effect its objects and to promote justice." ' " (*Morse* v. *Municipal Court* (1974) 13 Cal.3d 149, 156 [118 Cal.Rptr. 14, 529 P.2d 46]; accord, *People* v. *King* (1978) 22 Cal.3d 12, 23 [148 Cal.Rptr. 409, 582 P.2d 1000], citing § 4.)

"Consistent with that general principle, appellate courts first examine the language of the code section to determine whether the words used unequivocally express the Legislature's intent. If no ambiguity, uncertainty, or doubt about the meaning of the statute appear, the provision is to be applied according to its terms without further judicial construction. [Citations.]

"When the language of the section is on its face ambiguous or leaves doubt, . . . , the court must resort to extrinsic aids to ascertain the purpose behind the statute and give the provision a judicially created meaning commensurate with that purpose. [Citations.]" (*Morse* v. *Municipal Court, supra,* 13 Cal.3d at p. 156.) " 'To evaluate [a] claim of vagueness, this court will "look first to the language of the statute, then to its legislative history, and finally to California decisions construing the statutory language. [Citation.]" ' " (*Tapp* v. *Municipal Court* (1989) 216 Cal.App.3d 1030, 1035 [265 Cal.Rptr. 267], citing *Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 246 [158 Cal.Rptr. 330, 599 P.2d 636].)

Having examined the language of the statute, we find there is room for doubt regarding the meaning of "privity" as used in section 261, subdivision (a)(3). As noted by the parties, the word "privity" has many meanings—some common, some exclusive to the law.

For example, the Oxford English Dictionary (2d ed. 1989) pages 523-524, defines "privity" in the following ways:

"1. A thing that is kept hidden or secret.

". . . . . . . . . . . . . . . . . . . . .

"b. A secret matter, design, purpose, or plan; a secret. Obs.

"c. One's private thought or counsel; private business; personal affairs. Obs.

"2. The condition of being private; privacy, seclusion, . . . concealment, secrecy; chiefly in phr. in privity, in privacy, in private. Obs.

"3. Private or secret fellowship; intimacy, familiarity. Obs.

"4. The private parts. Chiefly in pl. Now rare.

"5. The fact of being privy to something; participation in the knowledge of something private or secret, usually implying concurrence or consent; private knowledge or cognizance.

"6. Law. Any relation between two parties recognized by law, e.g. that of blood, covenant, tenure, lease, service, etc.; mutual interest in any transaction or thing." (Quotations omitted.)

Webster's Unabridged Dictionary defines "privity" in much the same way. There, it is defined as: "1 something that is not made public or displayed . . . 2 *obs*: private condition (as of life or position) . . . 3: private knowledge or joint knowledge with another of a private matter . . . 4a: a connection between parties (as to some particular transaction) b: mutual or successive relationship to the same rights of property: the relationship between privies whereby they succeed to the same legal right or duty derived from a common source" (Webster's Third New Internat. Dict. (3d ed. 1961) p. 1805.)

Black's Law Dictionary (6th ed. 1990) provides, in part, the following definitions: "In its broadest sense, 'privity' is defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right. [Citations.] Derivative interest founded on, or growing out of, contract, connection, or bond of union between parties; mutuality of interest. [Citation.] . . .

"........................................

"Private knowledge; joint knowledge with another of a private concern; cognizance implying a consent or concurrence. *See* Insider; Legal privity; Privy." (Black's Law Dict., *supra*, at p. 1199, col. 1.)

Finally, an older version of Roget's International Thesaurus listed "privity" among the synonyms for knowledge. (Roget's Internat. Thesaurus (21st ed. 1961) p. 328.) The question remains then which of these definitions was intended by the Legislature.

The history of section 261 reveals that it was originally enacted in 1872 and was derived from title X, chapter 1, section 319, subdivision 5 of the New York Penal Code which provided:

"Rape is an act of sexual intercourse accomplished with a female not the wife of the perpetrator, under either of the following circumstances:

"...................

"5. Where she is prevented from resisting by any intoxicant, narcotic or anesthetic agent administered by or with the privity of the accused. . . ." This New York statute has been amended to such a degree that its modern successor bears little resemblance to the form from which the California statute was derived. The California statute as it existed in 1872 has left no clear trail of definition.

Thus, we turn to the California cases that have addressed rape accomplished by the administration of intoxicants. In researching this issue of first impression, we discovered that a mere six cases have been published since the rape statute was first enacted in the late 1800's. The earliest of these cases is *People* v. *O'Brien* (1900) 130 Cal. 1 [62 P. 297].

In *O'Brien*, the defendant invited the prosecutrix to enter his father's hotel to have "some refreshments." On his invitation, the prosecutrix had one drink of whisky and continued to drink thereafter either on the defendant's invitation or that of others. Defendant subsequently offered to drive her home and she accepted. On the way, they stopped at another saloon and despite her inebriated condition, the prosecutrix had another drink at defendant's invitation. After they resumed their trip, they were seen by two witnesses. One said the prosecutrix was "a little bit intoxicated" while another witness could not confirm or deny the prosecutrix's state of sobriety. The two were next seen after dark in front of a house. By this time, the prosecutrix was out of the wagon, "lying on the road, incapable of motion and presumably insensible" as she was lifted back into the wagon by some witnesses summoned by defendant for that purpose. When they were next seen, approximately one-half to one mile down the road, the prosecutrix was entirely unconscious and remained so until she was put to bed.

The defendant was later charged with "having sexual intercourse with the prosecutrix, 'who (it is alleged) was . . . prevented from resisting said act . . . by certain intoxicating, narcotic, and anesthetic substance administered to her by and with the privity of' defendant." (*People* v. *O'Brien, supra,* 130 Cal. at p. 3.) At trial, the prosecutrix testified that she remembered nothing after her second drink at the hotel—although from the condition of her clothes and person it was quite apparent that "some one had had connection with her." (*Id.* at p. 4.) Defendant was convicted despite his introduction of evidence tending to impeach the prosecutrix's chastity and otherwise cast suspicion on her testimony.

On appeal, the critical issue facing the court was "whether [the act of intercourse] took place before or after the prosecutrix became unconscious,

or otherwise incapable of resistance." (130 Cal. at p. 5.) The court noted the lack of direct evidence on this point except for the testimony of the prosecutrix to the effect that she was unconscious of the act. The court then found that, in light of the jury's credibility determination favoring the prosecutrix, each of the elements of the crime had been sufficiently proven, namely, "the administering of intoxicating liquor, and the perpetration of the act when she was in a state of unconsciousness or in such condition as to be incapable of resistance . . . ."[14] (*Id.* at p. 5.)

Our Supreme Court last addressed the crime of rape by intoxicant in *People* v. *Ing* (1967) 65 Cal.2d 603 [55 Cal.Rptr. 902, 422 P.2d 590]. In *Ing*, a 17-year-old girl sought the defendant doctor's aid in obtaining an abortion. The doctor agreed to help and a series of office visits was scheduled. On each of four visits, the doctor gave the girl a shot which made her feel dizzy and thereafter engaged in sexual intercourse with her.

During the defendant's trial, the prosecutrix testified that she "didn't care about anything" after receiving the shot and further, that she would not have had intercourse with defendant had it not been for the shots. (*People* v. *Ing, supra,* 65 Cal.2d at p. 607.) The defendant was subsequently found guilty of three counts of rape of the prosecutrix to whom he administered an intoxicating narcotic or anesthetic substance that prevented her from resisting. (*Id.* at pp. 606-607.)

On appeal, the Supreme Court summarily rejected the defendant's claim that the evidence was insufficient to support the verdicts. (65 Cal.2d at p. 612.)

---

[14]As previously noted, at the time of appellant's trial, section 261, subdivision (a)(4) defined rape in the following manner: "Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [¶] [w]here a person is at the time unconscious of the nature of the act, and this is known to the accused." In the two published cases addressing this particular subdivision of the rape statute, the courts focused on whether the victim was conscious of the *nature* of the act. (See *People* v. *Ogunmola* (1987) 193 Cal.App.3d 274 [238 Cal.Rptr. 300], a doctor who, under the pretext of performing a manual pelvic examination, actually engaged in sexual intercourse with his patient, was guilty of rape; cf. *Boro* v. *Superior Court* (1985) 163 Cal.App.3d 1224 [210 Cal.Rptr. 122], a doctor who obtained a female patient's consent after he misrepresented to her that sexual intercourse was medically necessary treatment, was not guilty of rape because patient was conscious of nature of the act.)

However, in 1993, our Legislature amended section 261, subdivision (a)(4) to define "unconscious of the nature of the act" in such a way so as to include victims who were either asleep or unconscious at the time of the act or were simply not aware, knowing, perceiving or cognizant that the act occurred. (Stats. 1993, ch. 595, § 1; § 261, subd. (a)(4)(A), (B). This change did not become effective until *after* appellant's trial. (Stats. 1993, ch. 595, § 1.) We have not been called upon to decide, nor do we express any opinion regarding, the possible legislative intent in effectuating this change.

The Second Appellate District first addressed this offense in the published case of *People* v. *Crosby* (1911) 17 Cal.App. 518 [120 P. 441]. There, the defendant, a complete stranger, telephoned the victim, who was over 17 years of age, to inquire whether she would accept employment with him. She agreed to do so and, on her first day of work, accepted the defendant's invitation to have dinner with him. They went to a public restaurant where a waiter served them some red wine from a bottle. The prosecutrix claimed to have consumed only one glass of wine during the six and one-half hours they stayed at the restaurant. During this time she asked the defendant to take her home and he refused. They left the restaurant and ultimately ended up at a lodging house where the defendant obtained a room while the victim stood idly by—knowing of the wrongfulness and impropriety of her actions. Despite numerous opportunities to do so, the victim never cried out for help or tried to flee. She claimed to be under the influence of a drug which prevented her from doing so.

Within 36 hours of the act of intercourse, the victim was, coincidentally, seen by a doctor who noticed that she seemed extremely nervous, somewhat dazed, and had a rapid and irregular heartbeat. When questioned during trial as to what might be responsible for her condition, the doctor said he did not know for certain but was under the impression that the victim was suffering the effects of some kind of narcotic. The doctor's conclusion was bolstered somewhat by the testimony of the victim's mother who said that the day after the incident, her daughter was a nervous wreck; that her eyes were dull and her memory impaired.

On appeal following the defendant's conviction for rape, the court noted the record failed to disclose any resistance on the part of the prosecutrix or use of force and violence on the part of the defendant. (17 Cal.App. at p. 521.) The court also found that the victim voluntarily accompanied the defendant to the room conscious of the purpose of going there as well as the impropriety of the act. However, citing to the evidence suggestive of the victim being secretly drugged, the court found the evidence weak but nevertheless sufficient to support the verdict rendered if based on the subsection involving a victim being "prevented from resisting . . . by any intoxicating narcotic, or anesthetic substance, administered by or with the privity of the accused." (*Id.* at p. 520.) The court indicated that it would have upheld the verdict had the jury not been influenced by the prosecutor's unrelated misconduct. (*Id.* at p. 524.)

The next published case to discuss rape by administration of an intoxicant is *People* v. *Wojahn* (1959) 169 Cal.App.2d 135 [337 P.2d 192]. *Wojahn* is similar to *Ing* in that it too involves the prosecution of a physician who

administered drugs to a female patient and thereafter engaged in sexual intercourse with her. In *Wojahn*, the doctor utilized a combination of drugs that caused the victim to feel "light and relaxed [with] her feet . . . glued to the floor [and] her body . . . swaying." (169 Cal.App.2d at p. 139.) She could not touch her nose with her fingers while her eyes were closed. (*Ibid.*) Yet, she remained capable of feeling the defendant having intercourse with her. (*Id.* at p. 140.) The doctor told her that he "did that" to raise her blood pressure.

The victim then left the doctor's office and reported the incident to a neighbor who in turn escorted her to the police station. The police officer noted that the victim was crying, hysterical, and appeared to be drugged. (169 Cal.App.2d at p. 139.)

Physical examination of the victim failed to reveal any signs of trauma. No tests were performed that could have confirmed the presence of an intoxicating drug.

At trial, the medical expert for the prosecution testified that the victim's symptoms were consistent with those experienced by one under the influence of drugs. Not surprisingly, the defense medical expert came to the opposite conclusion.

The defendant was convicted and thereafter sought appellate review. His primary challenge related to the sufficiency of the evidence to support his conviction. In affirming the conviction, the court referred only to the evidence that showed the doctor had administered the drugs and the resulting effects they had on the victim. (169 Cal.App.2d at p. 141.)

In *People* v. *Salazar* (1983) 144 Cal.App.3d 799 [193 Cal.Rptr. 1], the First District Court of Appeal was asked to decide whether the trial court erred when it failed to instruct the jury that resistance by the victim was an element of rape accomplished by force or fear under section 261, subdivision (a)(2). (*Salazar, supra,* 144 Cal.App.3d at p. 806.) In advancing his claim of error, appellant therein argued it was "inconceivable that the Legislature would eliminate the resistance requirement in force cases while retaining it in drug and alcohol cases."[15] (*Id.* at p. 807.) In response, the court reconciled the two provisions in the following way: " 'To instruct that a defendant is guilty of rape when the victim's will was overcome with intoxicants is to invite an irrelevant inquiry regarding the voluntariness of the victim's ingestion.' A lay jury might conclude that a person who voluntarily ingests

---

[15]In 1980, the Legislature amended section 261, subdivision (2) to eliminate the resistance requirement. (*People* v. *Salazar, supra,* 144 Cal.App.3d at p. 808.)

a substance has not submitted to sexual intercourse against her will. It is less confusing to instruct a jury that rape occurs when the person is prevented from resisting by alcohol or drugs." (*Id.* at pp. 807-808.)

The final case in this area is *People* v. *Mack* (1992) 11 Cal.App.4th 1466 [15 Cal.Rptr.2d 193]. In *Mack*, the defendant was charged and convicted of rape under section 261, subdivision (a)(3) and first degree murder. During deliberations, the jury was given a supplemental instruction that defined the terms "administered" and "privity" contained in CALJIC No. 10.65 (the instruction defining the general criminal intent necessary for rape and the defense of a good-faith belief in consent). (*Mack, supra,* 11 Cal.App.4th at p. 1479.)

Following conviction, the appellate court was asked to determine whether the jury was properly instructed as to the meaning of "administered." The challenged instruction defined "administered" to mean "directly applied the substance to the body of the other person *or caused or procured* the other person to take the substance into her system." (11 Cal.App.4th at p. 1480, italics in original.)

In approving the use of the instruction, the court declared: "[T]he qualifying term 'administered by or with the privity of the accused' requires only that the defendant has instigated the victim's ingestion of resistance-suppressing substance. The qualifying term simply excludes criminal liability for situations where a person engages in a sexual act with a partner who has reached a resistance-suppressed state (that is short of insensateness) . . . through no encouragement by the defendant. It is clear the Legislature did not intend criminal liability in such a case, because otherwise, the statute would proscribe intercourse *whenever* resistance is prevented by some intoxicating, anesthetic, or controlled substance (which would be the result if the qualifying phrase 'administered by' were not a part of the statute." (*People* v. *Mack, supra,* 11 Cal.App.4th at p. 1481, fn. omitted, italics in original.)

While we agree with the *Mack* court's definition of "administer," we do not believe the opinion can be read as specifically defining the term "privity." As the opinion makes clear, the *Mack* court was never asked to decide whether the jury was properly instructed on the meaning of privity; the reason being that the parties agreed with the definition provided by the trial court and did not challenge it on appeal. (*People* v. *Mack, supra,* 11 Cal.App.4th at p. 1479.) As such, any language in the opinion purporting to define "privity," while helpful, is dicta.

Nor can we look to the remaining California cases for assistance in our quest to uncover the meaning of "privity." In each of these cases, the

accused was directly involved in the administration of the intoxicant, anesthetic, or controlled substance.

Returning to the language of the statute, we note that the phrase "administered by or with the privity of the accused" is in the disjunctive. As such, we believe the Legislature intended to provide two distinct methods by which a defendant could be held criminally responsible for a sexual encounter he has with another person whose ability to resist is suppressed by the consumption of any of the enumerated substances. The first method, encompassed within the phrase "administered by . . . the accused," is clearly meant to address a defendant's direct involvement with the victim in the administration of the listed substance. In other words, the accused personally applies the substance to the body of the victim or personally causes, procures, instigates or encourages the victim to take the substance into his/her system. Thus, the second method, as defined by the phrase, "administered . . . with the privity of the accused," necessarily refers to some other type of involvement on the part of the defendant.

It has been suggested that this phrase ought to be interpreted to mean the substance was administered with the bare *knowledge* of the defendant. We believe the statute calls for something more.

Both historically and in present-day parlance, "privity" has meant more than mere knowledge, as evidenced by the definitions of the word previously set forth. After an exhaustive search, we found one case decided around the time this statute was enacted that addressed the definition of "privity" in a nonproperty setting.

In *Quinlan* v. *Pew* (C.C.D.Mass. 1893) 56 Fed. 111, the court was asked to determine whether a ship owner ought to be held liable for the acts of his servants and agents under a statute that predicated liability on a finding of "privity." After determining that the statute did not employ the word in its technical sense, the court made the following observations regarding the common definitions of "privity" in use at that time:

"The word 'privy' which undoubtedly is the root of the common word 'privity,' is defined by Bouvier as follows: 'Privy. One who is a partaker, or has any part or interest, in any action, matter, or thing.' The ordinary sense of the word 'partaker' implies activity; and, clearly, the owners in this case were not in that sense partakers in the cause of the appellant's misfortune. The remaining portions of Bouvier's definition are so general and indefinite as to require us to look further. ■ The Century Dictionary, after giving several definitions of the word 'privity' not pertinent here, contains the

following: '(5) Private knowledge; joint knowledge with another of a private concern, which is often supposed to imply consent or concurrence.' As illustrating this, the dictionary cites the following sentence: 'This marriage brought upon Garcilasso, in consequence of his privity, the displeasure of the emperor.' We believe this correctly expresses the meaning of the word as used in this statute. Webster's International Dictionary, among other definitions of this word, gives the following: '(2) Private knowledge; joint knowledge with another of a private concern; cognizance implying consent or concurrence,'—and illustrates by a quotation from Swift, 'All the doors were laid open for his departure, not without the privity of the Prince of Orange.' The basis of the word is said to be the French 'privaute,' which this dictionary makes the equivalent of extreme familiarity. Worcester's Dictionary is to the same effect. No one can read these definitions of privity without understanding that its ordinary use implies knowledge and something more, and in no event anything less. They convey the idea of a private or other special or particular knowledge, or of such cognizance as implies active consent or concurrence.

"We therefore conclude that the word 'privity,' as found in this statute, includes at least as much as the word 'knowledge;' but we of course do not overlook the fact that there is in law imputed knowledge, and therefore there may be imputed privity. Each of these arises where the owners give an order for the doing of a particular thing in a particular way, and assume that it is done, or do not inquire whether or not it is afterwards accomplished. Under such circumstances the word 'privity' is even more pertinent than 'knowledge,' because, while the conduct of the owners would in law impute knowledge, they would also actively partake. Each is also imputed to those who refuse to see, or who are guilty of perverseness, or of such crass negligence as amounts to it." (*Quinlan* v. *Pew, supra,* 56 Fed. at p. 117.) Comparing these definitions with those found in present-day dictionaries shows that the meaning of "privity" has remained fairly constant despite the passage of time.

Certainly, it is a realistic observation that the word "knowledge" was a word in common usage at the time this statute was originally enacted. We can see no reason, and none has been advanced, why the Legislature would choose to employ "privity"—a word of far more diverse and complex meaning—when a word of much simpler meaning would have served their purpose *if* that had been their intention. It is for this reason that we believe the Legislature, in drafting the statute as it did, required more than bare knowledge to hold one criminally culpable under this statute.

We thus conclude the phrase "administered . . . with the privity of the accused," was designed to cover situations where the accused has no personal and direct involvement with the victim in the administration of the

resistance-suppressing substance. His involvement is indirect; as where the accused encourages, facilitates, or instigates another to administer the resistance-suppressing substance to the victim. It also requires that he know of the intoxicant's administration.

The type of involvement which satisfies this provision is similar to that necessary to be held criminally accountable as an aider and abettor. There is, however, one significant difference. In order to be considered an aider and abettor, the act being encouraged or facilitated must constitute a crime. (§ 31.) Here, by contrast, the act being encouraged (i.e., the intake of the resistance-suppressing substance), under many circumstances is not criminal in nature. For example, encouraging one of legal drinking age to consume alcohol, or a physician directing his nurse to give a patient an analgesic to relieve pain.

Under these circumstances, the person who encouraged or directed another to administrator the resistance-suppressing substance to the victim and, with knowledge of its administration, thereafter engages in sexual intercourse with the victim whose resistance has been suppressed, will be held accountable under section 261, subdivision (a)(3). Whereas without some additional showing, the person who actually administered the substance would not.

We also share the view of the *Mack* court that one who engages in sexual intercourse with a partner who has reached a resistance-suppressed state (short of insensateness) through no encouragement of the defendant is exempt from criminal liability under section 261, subdivision (a)(3). However morally reprehensible such conduct may be, we are constrained by the language of the statute in effect at the time of commission of these offenses and cannot substitute our view as to what the law should prohibit.[16]

We recognize that, when instructing the jury on the meaning of privity, the trial court relied on the then-current language of CALJIC No. 10.02. It has become evident that, in modern society, the word "privity," standing alone, is inadequate to define for the lay jury the conduct needed to hold one criminally liable under section 261, subdivision (a)(3). Indeed, the Committee on *Standard Jury Instruction recognized this shortcoming in the statutory*

---

[16]The shortcoming in the statute was recently remedied by our Legislature. During special session, the Legislature approved a bill that would modify the definition of rape set forth in Penal Code section 261, subdivision (a)(3) by deleting the language "administered by or with the privity of the accused" and replacing it with "and this condition was known, or reasonably should have been known by the accused" so that the subdivision would read as follows: "Where a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused." (Stats. 1993-1994, First Ex. Sess. ch. 40, § 1.)

The Governor approved this change on September 25, 1994. (*Ibid.*)

language and voiced its concern in the Use Notes accompanying the original version of CALJIC No. 10.02.[17] Thus, appellant is correct when he asserts that the court erred in using this instruction in that it equates privity with mere knowledge.

■ Appellant is also correct in his claim that the trial court erred when it instructed the jury that the words "give" or "furnish" are synonymous with "administered" as that term is used in section 261, subdivision (a)(3). While those terms are indeed synonyms for "administer," we believe they do not properly reflect what is required under the statute. We believe the word "administered" refers to the direct application of an enumerated substance to the body of the victim by: (1) the accused or his agent; or (2) the victim at the direction of or in response to encouragement by the accused or his agent. The application can be accomplished by injection, inhalation, ingestion, or any other means.

*Prejudice*

■ We must next determine whether these errors are of such magnitude so as to require reversal. ■ "Instructional error, 'even with regard to an element of an offense,' is measured under the 'harmless beyond a reasonable doubt' standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24. . . ." (*People* v. *Wader* (1993) 5 Cal.4th 610, 642 [20 Cal.Rptr.2d 788, 854 P.2d 80].) Recently, the United States Supreme Court elaborated on this standard: "Harmless-error review looks, we have said, to the basis on which 'the jury *actually rested* its verdict.' [Citation.] The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee. [Citations.]" (*Sullivan* v. *Louisiana* (1993) 508 U.S. __, __ [124 L.Ed.2d 182, 188, 113 S.Ct. 2078, 2081-2082].) ■ Based on this standard, we conclude the instructional errors were prejudicial.

The record shows that Lorena consistently testified that no one encouraged her to drink that evening. Shana, on the other hand, testified that all three men encouraged Lorena to drink so that they could take advantage of Lorena.

---

[17]In this note, the committee stated it deleted the word "privity" from the instruction used to define this crime "because it [was] no longer generally known in the context used in the Penal Code."

On this state of the evidence, the jury could have credited Shana's testimony and based their verdict on a finding that appellant personally administered the alcohol. Or, the jury could have found appellant guilty based *solely* on a finding that appellant knew that Lorena had consumed some alcohol—a finding which we have concluded would be inadequate to support a conviction under section 261, subdivision (a)(3). Because we are unable to determine which of these methods the jury relied on in reaching its verdict, and even though substantial evidence exists which would support a conviction based on a finding of administration by appellant, the conviction must be reversed.

## II

*Remaining Contentions**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed.

Vartabedian, J., and Harris, J., concurred.

---

*See footnote *ante*, page 143.