Filed 11/22/13  P. v. Villalobos CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C072755 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F3930) |
| v. | |
| RAMON DANIEL VILLALOBOS, | |
| Defendant and Appellant. | |

A jury found defendant Ramon Daniel Villalobos guilty of possessing marijuana for sale and transporting it, and possessing a switchblade knife.  The trial court sustained four of six recidivist allegations.  After denying defendant's invitation to exercise its discretion to strike any of the prior conviction findings, the court then sentenced defendant to state prison for an indeterminate term of 26 years to life.

1

On appeal, defendant contends the trial court erred in excluding testimony from his mother (a purported qualified medical marijuana patient)[1] regarding his status as her primary caretaker,[2] and in refusing to hold a foundational hearing regarding a proposed defense expert. He maintains that the evidence is insufficient to establish that a prior Illinois conviction comes within the meaning of Penal Code section 667, subdivision (d)(2).[3] Finally, he asserts that the court erred in refusing to exercise its discretion to strike any of the prior conviction findings. (§ 1385.) We agree there is insufficient evidence to establish that the Illinois conviction comes within section 667, although this does not have any practical effect on his sentence. We otherwise shall affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In April 2012, a special agent assigned to the police department was on patrol in downtown Redding with a partner. Having observed the tattoos on the arms of the driver of a pickup truck, the agent made a U-turn and followed, determining that the brake light on the top of the pickup's cab was inoperable. The agent decided to make a traffic stop.

Defendant was the lone occupant of the truck. He got out, and the agent's partner frisked him. There was a switchblade in one of defendant's pants pockets. In the other was $910 in cash. Searching the bed of the truck, the agent saw a duffle bag. Defendant admitted that the agent would find about a pound of marijuana belonging to him inside.

---

[1] A person entitled to the protections of the Compassionate Use Act (CUA), enacted via initiative in 1996 as Health and Safety Code section 11362.5. (*Id.*, § 11362.7, subd. (f).)

[2] An individual whom a qualified patient designates as the person who has consistently assumed responsibility for the patient's housing, health, or safety. (Health & Saf. Code, § 11362.5, subd. (e).) The same definition appears in the Medical Marijuana Program Act (MMP Act) (*id.*, § 11362.7 et seq.). (*Id.*, § 11362.7, subd. (d).)

[3] Undesignated statutory references are to the Penal Code.

Inside the duffle bag was a plastic bag labeled "470" and "Black Mamba" containing a little less than one pound of marijuana. There were also a small glass jar and a plastic container with more marijuana buds. The agent also seized a cellular phone from the truck's cab.

After being advised of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694], defendant agreed to speak with the agent. He was taking a pound of marijuana to get money for his girlfriend and for rent. He was broke, and his girlfriend, who was pregnant, had not been working. Half of the money in his pocket was from work, and half was from selling marijuana. Defendant later told the agent that the seized marijuana was not for purpose of sales; defendant had a doctor's recommendation for the use of marijuana for medicinal purposes (although he did not have it with him), and he was returning this medicinal marijuana to the "co-op" because it was "bad." He did not mention anything about taking the seeds in the marijuana to any co-op, or about being in the process of helping his mother with her marijuana needs.

There were many texts and pictures retrieved from the cellular phone. We do not need to relate all the details contained in the briefs of the parties. Suffice it to say that a prosecution witness asserted that the context of these, including those on the day of defendant's arrest, involved the sales of marijuana. Among these were a text message earlier on the afternoon of the arrest that had included a picture of defendant holding the plastic bag seized from his duffle bag, in which he asserted that he had "Hit pay dirt," had as many as needed at "[$]1,000 a pop," and said he would "come see you with one." Shortly before his arrest, defendant had also texted a caution that he would "Just bring one or two because the other was moldy inside."

The defense attempted to provide an innocent context for the contents of the cell phone, asserting that they referred only to defendant's legal purchase of marijuana (and not sales) or to work-related communications. Again, we do not need to elaborate on the

3

details of the testimony of defendant or his coworker, as we presume the jury resolved these evidentiary conflicts against defendant (*People v. Mack* (1992) 11 Cal.App.4th 1466, 1468); in this respect, as we note in the Discussion, the trial court specifically commented at sentencing that it believed defendant's testimony lacked any credibility whatsoever.

With respect to other defense evidence, his parole agent attested that defendant was authorized to possess up to eight ounces of marijuana on his person for medicinal purposes and grow up to six plants. A roommate testified she paid him $400 for rent in $100 bills a couple of days before his arrest.

Defendant testified he lived in an apartment around the corner from his mother's. She was 63, and had a number of health issues for which medical marijuana was recommended. As she had lung problems, she could not smoke it; she ingested it instead. Defendant visited her on a daily basis; he assisted her husband, who "does everything for her,"[4] in caring for her. This included housekeeping, handyman tasks, health care, and administering her marijuana.

Defendant had familiarized himself with the parameters of authorized medical marijuana usage. He was a member of a medical marijuana co-op, in which he could bring in marijuana for "in-store" credit from the co-op's garden; he and his mother shared their allocation from the co-op.

On the weekend before his arrest, defendant had stopped at his mother's house. She had thrown out marijuana in her garbage can and in the dumpster because it had too many stems for ingestible marijuana. He retrieved this (along with other discards

---

[4] Although the parties do not refer us to any testimony at trial in this respect, the mother testified at the foundational hearing at issue in the Discussion that the county paid her husband under Welfare and Institutions Code section 12300 et seq. to be her in-home caregiver.

collected in a bag), sifted through it to collect what was usable, and intended to bring the remainder to the co-op to exchange it for replacement marijuana. He was in the process of taking it to the co-op when the agent stopped him. Half of the contents of the bag belonged to him and half to his mother. (He did not explain either how his half came to be part of what his mother threw away, or came to be admixed with what his mother threw away.) He did not have any intent to sell the marijuana in the bag. He was also going to distribute the seeds in the bag to various co-ops. He had told the agent that he was seeking monetary credit from the co-op for "donating" back the marijuana, not that he was selling it. The agent induced him to admit that he was selling marijuana with promises that he could either keep his truck or the cash seized from him.

## DISCUSSION

### I. The Court Properly Excluded the Mother's Proposed Testimony

#### A. *Foundational Evidence*

At a foundational hearing before trial, defendant's mother testified that she had a doctor's recommendation authorizing her to possess eight ounces of marijuana for medical purposes. She did not have it with her in court, but represented that her husband had it in his possession outside the courtroom. Defendant had been coming over every day to assist with the repair and maintenance of her home. She is blind in one eye, and has congestive heart failure, coronary/pulmonary disease, rheumatoid arthritis, and diabetes; as a result, she needs care 24 hours a day. Since defendant's release from his most recent incarceration, she "was relying on him quite a bit, giving [her] husband a break [who has] been doing it for approximately 10 years." The county paid for only a limited number of hours of care from her husband; it did not pay for her son's services.

The mother believed that the pound of marijuana seized from defendant's truck had its source at her home. She had directed her husband to throw away old marijuana that was not any good for her purposes; she thought it looked moldy with bug splotches,

5

which would make her ill if ingested. She thought there was about 12 ounces. In throwing it away, she wrapped it in scrap plastic wrap that did not have any writing on it. She and defendant shared their supplies of marijuana. When he came to her home the next day, she mentioned throwing away the spoiled marijuana. She did not testify specifically that she had authorized defendant to try to salvage it; when asked directly about this point, she said only that she had told him it was in the trash, and in retrospect she was sorry that she had done so. She also did not know when he retrieved it from the trash. She admitted that she never saw the marijuana found in the truck, and only assumed it was the same because his arrest was a day or two after she told him about the discarded marijuana.

For purposes of its ruling, the court assumed there was proof of a valid marijuana recommendation for possessing eight ounces. It concluded the testimony failed to show that defendant was acting at his mother's behest in retrieving the marijuana for salvage. It also concluded the evidence did not establish that defendant was his mother's *primary* caregiver, as opposed to assisting in her care. Therefore, as the proposed testimony did not have anything to do with a defense under the CUA, the court excluded it as irrelevant. Defendant raised the issue again in his motion for new trial; the court did not find any basis for questioning its earlier ruling.

### B. Analysis

The MMP Act, a legislative clarification of the CUA (*People v. Solis* (2013) 217 Cal.App.4th 51, 57), provides immunity from criminal liability for a primary caregiver who transports marijuana (or possesses for sale to recoup the actual costs of providing it on behalf of a qualified patient). (Health & Saf. Code, § 11362.765.) To come within the definition of a "primary caregiver," a defendant must establish a consistent assumption of responsibility for the qualified patient's care independent of assisting in the provision of marijuana, arising at or before the assistance in providing

6

marijuana; the defendant must also establish that he is the patient's designated primary caregiver. (*People v. Mentch* (2008) 45 Cal.4th 274, 283-285; *People v. Mower* (2002) 28 Cal.4th 457, 475.)

It was defendant's burden at the foundational hearing to present evidence sufficient to raise a reasonable doubt about the presence of all of these elements of a MMP Act defense. (*People v. Jackson* (2012) 210 Cal.App.4th 525, 533; *People v. Jones* (2003) 112 Cal.App.4th 341, 349 [sufficient foundation where evidence, if jury credits it, raises reasonable doubt that doctor authorized use of marijuana for medical purposes].) We review a trial court's decision to exclude evidence after a foundational hearing for an abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 197 (*Williams*).) A trial court's exclusion of defense evidence pursuant to nonarbitrary or nondisproportionate state evidentiary rules does not violate a defendant's state or federal constitutional trial rights unless it denies a meaningful opportunity to present a defense, such as through the exclusion of important evidence. (*Holmes v. South Carolina* (2006) 547 U.S. 319, 324, 326 [164 L.Ed.2d 503]; *People v. Linton* (2013) 56 Cal.4th 1146, 1202; *People v. Pollock* (2004) 32 Cal.4th 1153, 1173.)

We agree with defendant that he established his consistent provision of care to his mother. We disagree that the evidence established her husband "did not and could not provide all the care required," making defendant's assistance essential. To the contrary, defendant's mother noted that her husband had been providing all her care for 10 years, and was doing so once again after defendant's arrest. Furthermore, she never testified that she had ever designated defendant, as opposed to her husband, as her primary caregiver; her testimony thus established at best that she relied on defendant as a backup or relief caregiver, not as her *primary* caregiver. Defendant has not provided any authority that one qualified patient may designate multiple "primary" caregivers. (See *People ex rel. Lungren v. Peron* (1997) 59 Cal.App.4th 1383, 1396 [rejecting concept that qualified patient could

7

designate everyone who provided marijuana seriatim as primary caregivers].)  Even if believed, her testimony therefore failed to raise a reasonable doubt that defendant was her primary caregiver.  Accordingly, the trial court did not abuse its discretion in excluding this evidence.

In addition, the mother's testimony failed to establish *any* foundation for a rational conclusion that the discarded marijuana and the marijuana seized from defendant were one and the same.  She was not even aware of when defendant may have retrieved the marijuana from the trash, and never authenticated the seized pound of marijuana as being derived from her own 12-ounce moldy and bug-spotted discard.  The only evidence at trial referencing mold was the text message (to "Robert") about "the other" marijuana.  It thus would be pure speculation at trial to allow use of the mother's testimony to corroborate defendant's testimony to this effect.  The trial court's *result* was therefore correct for this reason as well. (*People v. Brown* (2004) 33 Cal.4th 892, 901 [may affirm evidentiary ruling on different grounds having support in the record].)

Defendant, in conclusory fashion, describes this evidence as having "significant probative value" and thus its exclusion "eviscerated" his case, resulting in a violation of his constitutional rights.  Such is hardly the case.  Defendant was allowed to raise an MMP Act defense, with the jury accordingly instructed.  Defendant provided his own testimony in support of this defense.  His mother's testimony was therefore simply corroborative, with its source being a witness with obvious bias.  The evidence consequently was neither highly probative, nor central to his defense.  As a result, the ruling of the trial court did not transgress the charters of our state and nation.

## II.  The Court Properly Declined to Hold a Foundational Hearing

### A.  *Background*

At the same time defendant sought the foundational hearing about his mother's proposed testimony, he noted that he had a defense expert he wanted to call at trial to

8

testify about the operational practices of marijuana co-ops and dispensaries. The trial court asked if this testimony would involve opinions about whether those operations were lawful under the MMP Act. Defense counsel responded, "Kind of." The court asserted its belief that it was not lawful to trade marijuana with a co-op, and in any event would not allow the expert to "testify about the way he . . . interprets the law." Defense counsel replied, "That makes sense to me." The court also declined to allow the expert to testify that individuals *in general* are recommended much larger quantities of medical marijuana if they need to ingest it rather than smoke it, ruling that the only relevant evidence would be the *specific* recommendation for the mother (as established through testimony from the mother or her doctor to this effect).

On the following day, defense counsel renewed his request for a foundational hearing on the proposed expert testimony. He made an offer of proof that the expert would offer an opinion about the effect of mold on the usability of marijuana generally, and to offer an opinion about his observations of the seized marijuana. The expert would also give his opinion that the law allows qualified patients to trade their marijuana with each other. The court stated that both usability and the legality of trading marijuana were opinions on questions of law[5] (ignoring the proposed testimony about the expert's observation of the seized marijuana) and therefore were not permissible subjects of expert testimony.

In his motion for new trial, defendant also revisited this issue as well. The trial court adhered to its earlier ruling.

---

[5] However, at trial the court allowed the agent to testify that the seized marijuana represented a usable quantity far in excess of what the average user could smoke in a day.

### B. Analysis

Apparently abandoning any claim that his proposed expert could offer opinions on questions of law (*Williams v. Coombs* (1986) 179 Cal.App.3d 626, 638, approved on this point and disapproved on another in *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 884, 885-886), defendant contends the trial court abused its discretion in declining to conduct a foundational hearing (*Williams*, *supra*, 16 Cal.4th at p. 196) with respect to the defense expert's opinions regarding the effect of mold on usability, whether the seized marijuana was in fact moldy, and whether the practice of marijuana co-ops allowed the exchange of old or bad product for new, "all of which would have corroborated why [he] was transporting it." We disagree that any of these subjects are beyond the common understanding of an ordinary juror such that expert testimony was necessary to establish them. Furthermore, we do not find prejudice from a lack of corroboration.

It does not take expert testimony to establish that mold (or bug specks) renders a product unusable (except, perhaps, in the case of cheese). Nor would it have taken an expert to examine the marijuana from defendant's truck and determine whether mold was present; defendant simply could have made that observation himself in his testimony. Finally, while the jury might not necessarily be familiar with the practices of marijuana co-ops, defendant was capable of describing his personal experience with exchanging marijuana for credit against future withdrawals.

As for the lack of corroboration, on the issue of mold defendant testified that he had *already* sifted through the marijuana discards from his mother, and presumably there would not have been any mold to observe (nor do the parties direct us to any testimony about the condition of the marijuana being less than optimal). As for corroborating that co-ops will exchange marijuana, in closing argument the prosecution never disputed defendant's representation to this effect. Rather, he argued that the case did not have anything to do with the defenses relating to medical marijuana because defendant simply

10

was a drug dealer *falsely* claiming this as an excuse, who was transporting an amount of marijuana far in excess of any reasonable medical needs.  To reiterate the point we have made before, the trial court described defendant's testimony as lacking credibility in any respect.  Therefore, we do not find it reasonably probable overall that defendant would have obtained a more favorable result had the expert testified.

### III.  The Illinois Conviction Evidence Is Insufficient

Among other recidivist allegations, the trial court sustained one that alleged a 1996 Illinois conviction for armed robbery came within the meaning of section 667, subdivision (d)(2).[6]  Defendant maintains that the evidence is insufficient to support this finding.  We agree.

In support of the allegation, the prosecution submitted the following evidence.  According to the Illinois judgment (and the accompanying docket), defendant entered a plea of guilty to robbery as a class 2 felony in March 1996.  From elsewhere in the portions of the "entire record of conviction" that necessarily reflect the facts of the offense (*People v. Trujillo* (2006) 40 Cal.4th 165, 179-180 (*Trujillo*)), the Illinois information alleged that defendant *and an accomplice* were "armed" with a firearm when they took a wallet from the person of the victim by means of force or threat of imminent force.

The People concede that the least adjudicated elements of the Illinois offense do not include the California element of asportation (See *People v. Rodriguez* (2004) 122 Cal.App.4th 121, 130 (*Rodriguez*)), and that resort to the facts in the Illinois record of conviction provided to the trial court in support of the allegation does not remedy this lacuna (*People v. Guerrero* (1988) 44 Cal.3d 343, 345, 354-355).  For this reason, we do not elaborate our analysis on this point any further.

---

[6]  The information actually alleged the parallel initiative provision in section 1170.12.

Instead, the People assert the Illinois conviction comes within the meaning of section 667, subdivision (d)(2) because it involves the *personal use* of a gun, which is either a violent felony (§ 667.5, subd. (c)(8), as construed in *People v. Piper* (1986) 42 Cal.3d 471, 478), or a "serious" felony (§ 1192.7, subd. (c)(8)).  They premise their argument on defendant's admission *to the probation officer in the present case* that he had " 'pulled out [his] gun, shoved it in [the victim's] face, and took [the victim's] shit.' " In making this argument, the People utterly ignore *Trujillo*, which specifically precluded consideration of statements in a probation report in the record of conviction; *Trujillo* concluded that these do *not* reflect the facts underlying a conviction because they are made "*after* [the] defendant was convicted" (*Trujillo*, *supra*, 40 Cal.4th at p. 180, italics added) and "with the protection of the double jeopardy clause" (*id*. at p. 179).  This reasoning applies with equal force to an admission in a probation report in a *subsequent proceeding*.  The record of conviction otherwise does not establish that it was defendant, as opposed to any accomplice, who personally used a firearm.[7]

The People fail to provide any other factual basis for finding that the 1996 Illinois conviction came with the meaning of section 667.  We therefore will vacate the finding. However, because defendant had two *other* prior convictions within the meaning of section 667, we do not need to remand for resentencing because the basis for his sentence is unchanged.  (See § 667, subd. (e)(2).)  The People may retry this superfluous finding if they find it important to do so.  (*Rodriguez*, *supra*, 122 Cal.App.4th at p. 137.)

## IV.  The Trial Court Did Not Abuse Its Discretion in Declining to Strike Findings

Before sentencing, defendant filed a perfunctory request (containing little other than the applicable legal standards) for the trial court to exercise its discretion under

---

[7] We note that in the police report associated with this conviction, which the prosecutor submitted in connection with sentencing, the victim reported that someone else held the shotgun, and defendant claimed it was his codefendant.

section 1385 to dismiss two of the prior conviction findings so that his sentence would be only doubled. (See § 667, subd. (e)(1).)

At the hearing, defense counsel had little to add in the way of argument. After commenting that it was "not . . . loathe" to exercise its power to strike, the court noted defendant's 2000 conviction in Texas for perjury and found that he also "absolutely" had lied under oath in the present case; "[t]he comments that he made about the phone calls w[ere] ridiculous. I mean it was embarrassing, frankly, to listen to some of the comments he was making . . . . [¶] It was clearly false testimony." The court concluded as a result that defendant "is willing to apparently do or say anything, use a weapon, say anything he needs to say, in order to try and get away with whatever he's trying to get away with." Therefore, the court was not prepared to accept defendant's account to the probation officer about the facts of his simultaneous 2000 Texas conviction for "sexual assault." Despite the "gift" of a sentence as a first-time offender in a 2006 California conviction, defendant "chose to get right back into those things that caused him all the problems in the past." As a result, a decision to strike any of the findings "would be potentially subjecting the public to additional danger because [defendant] is out there ready to do or say whatever it takes to do his thing." The court also found that the ameliorative 2012 amendments to section 667 did not apply to defendant because his 2000 Texas conviction for sexual assault disqualified him from consideration. (See Pen. Code, § 667, subd. (e)(2)(C)(iv)(I); Welf. & Inst. Code, § 6600, subd. (b).)

Defendant argues that the trial court abused its discretion in failing at least to exercise its discretion to strike his 2000 Texas conviction for sexual assault, noting that the 1996 Illinois robbery conviction occurred when he was "only" 17, that his criminal record otherwise (as reflected in the current probation report, along with the particulars of his juvenile record in a 1996 Illinois probation report) is not as serious as in *other* cases that have upheld a trial court's refusal to strike a finding, that the present offense was not

13

serious or violent, and that he had been taking steps toward becoming a productive member of society since his release from prison in 2011 after his 2006 conviction. He also points to his claim in the present case that he was acting under a belief that he was in compliance with the requirements of the CUA and the MMP Act. Essentially, defendant takes the tack of declaring a trial court's ruling to be an abuse of discretion, without demonstrating the irrationality or arbitrary nature of the trial court's reasoning. (*Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 588 [appellant's duty to establish error in trial court's reasoning].)

A trial court may exercise its discretion to strike a recidivist finding if, *and only if*, a defendant can be "deemed outside the . . . spirit" of the statute, giving "preponderant weight" to inherent statutory factors (such as the background, character, and prospects of a defendant, as well as the nature and circumstances of the present and previous felony convictions) and ignoring any factors extrinsic to the statute. (*People v. Williams* (1998) 17 Cal.4th 148, 159, 161.)

The burden is on defendant to demonstrate that the trial court's decision was unreasonable, rather than being one of alternative reasonable readings of the facts before the court. This requires a defendant to overcome a "strong" presumption on appeal that a court's denial of the request to exercise discretion is proper. (*People v. Carmony* (2004) 33 Cal.4th 367, 377, 378.) *Only* where the criteria undisputedly favor a defendant (i.e., where the facts essentially as a matter of law establish entitlement to relief) would the denial of a request to exercise its power to strike be an abuse of a court's discretion. (*Id.* at p. 375.)

Defendant's juvenile record began at age 15 in 1994 with theft, for which he received the equivalent of probation. The juvenile court revoked probation shortly afterward when he committed aggravated assault. The court suspended execution of sentence on a 30-day detention and reinstated him on probation. (At some unspecified

14

point he had been expelled from high school as a junior for carrying a concealed weapon—a lock tied to a handkerchief.) In 1995, the court ordered execution of the detention for failing to abide by his parents' authority, and reinstated him on probation. Later in 1995, he incurred an adult conviction for burglary, for which he was placed on probation with a condition of a six-month jail term. Next was the 1996 adult felony conviction for armed robbery discussed above. His Illinois criminal career ended with a 97-day jail term for trespass of a residence.

The only facts in the record regarding the 2000 Texas felony conviction for sexual assault (which the trial court found to be the equivalent of a rape conviction under section 261, a finding that defendant does not dispute) are defendant's comments in the probation report to which the trial court declined to give credence. Defendant claimed that he had consensual sex with the daughter of a homicide detective at a party, which resulted in a pregnancy "so he was charged because of who the victim was." As the trial court specifically noted, the one-page record of conviction reflected that he had also been convicted in the same proceeding of "aggravated perjury," and the Texas court had denied his application for probation.

Having made his way to California, defendant came to the apartment of the victim of the 2006 conviction asking for her male roommate, then asked to use the victim's phone. When she closed the door, he entered the apartment and again asked to use the phone. He pointed a knife at the victim, directed her into a bathroom, and then entered the roommate's bedroom (at which point he fled when a woman got out of the bed and confronted him). He committed two violations of parole in 2010 and 2011 in connection with his five-year prison sentence.

Defendant has patently failed to overcome the presumption in favor of the trial court's exercise of its discretion. Regardless of the commendable steps he has taken in his recent freedom from incarceration to be a productive member of society and care for

15

his mother, the record supports the trial court's conclusion that he was and continues to be manipulative and unconcerned with societal norms regarding truth-telling; that he has a lengthy continuing history of violence, which his present involvement in selling drugs (his unconvincing claim of subjective good faith in complying with the strictures for medical marijuana notwithstanding) and carrying a switchblade indicate is a continuing potential for recurrence; and that his very recent incarceration has obviously not had any rehabilitative effect, given the violations of parole and the commission of the present offense. Comparison with the facts of *other* cases reviewing the decisions of *other* trial courts on the totality of *other* records is a sterile exercise. (Cf. *People v. Rundle* (2008) 43 Cal.4th 76, 137-138 [review of sufficiency of evidence depends on unique facts of each case, thus comparisons between cases "of little value"].) As the trial court's resolution was anything but unreasonable, we therefore reject defendant's argument.

## DISPOSITION

The finding that defendant's 1996 Illinois conviction comes within the meaning of section 667 is vacated. The judgment otherwise is affirmed. The trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


BUTZ                    , J.


We concur:



RAYE                , P. J.



HOCH                , J.


16